[Civ. No. 20942. Fourth Dist., Div. Two. June 27, 1979.]

THOMAS D. WEAVER, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
MARSH STEWARD, JR., Real Party in Interest.

**COUNSEL**

Yusim, Cassidy, Stein & Hanger and Mal S. Duncan for Petitioner.

Robert E. Cartwright, Sanford M. Gage, Edward I. Pollock, Stephen I. Zetterberg, J. Nick DeMeo and Leonard Sacks as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Beam & Di Caro and John R. Di Caro for Real Party in Interest.

Hassard, Bonnington, Rogers & Huber, Howard Hassard, David E. Willett and A. Robert Singer as Amici Curiae on behalf of Real Party in Interest.

## OPINION

## McDANIEL, J.—

### INTRODUCTION

In the underlying action, Marsh Steward, Jr., M.D. (Dr. Steward), the real party in interest, filed a verified complaint in Orange County Superior Court (respondent) against Barbara Harmer (Harmer) and Thomas D. Weaver (petitioner). That complaint asserted two causes of action. In the first count, Dr. Steward charged both petitioner and Harmer with malicious prosecution based on Harmer's previous filing of a medical malpractice suit against Dr. Steward. Petitioner is the attorney who represented Harmer in those earlier and now-terminated proceedings.

In the second count, Dr. Steward charged that petitioner breached a duty of care owed to both Dr. Steward and the public when, allegedly, without adequate factual investigation and legal research, he advised Harmer that she had a valid medical malpractice claim against Dr. Steward and proceeded to represent her in filing the complaint noted. Dr. Steward contends, as a consequence of the lawsuit's filing, that his insurance carrier cancelled his coverage, causing him to suffer damage to his professional reputation and significant monetary loss.

After petitioner and Harmer answered Dr. Steward's complaint, they both filed motions for summary judgment which the trial court denied. Petitioner is now before us seeking a writ of mandate to compel the respondent trial court to vacate that order and to enter an order in his favor.[1]  As we shall later explain, it is our view that the trial court

---

[1]Harmer is not a party to this mandate proceeding.

properly exercised its discretion in denying petitioner's motion to the extent that it concerned the first cause of action, i.e., the count for malicious prosecution.

However, the trial court erred in ruling against petitioner with reference to the second cause of action. More particularly, we hold, as a matter of law, that an attorney owes no duty of care to adverse third parties in litigation.[2]

## SYNOPSIS OF THE FACTS

In April of 1973, Harmer, who eventually became petitioner's client, consulted Dr. Steward, a gynecologist, and requested an examination to determine whether she was pregnant. Dr. Steward performed a physical examination and a urinary pregnancy test, the results of which indicated pregnancy. Harmer, on being advised of those results, requested a therapeutic abortion, specifically, a dilation and curettage. Dr. Steward performed this procedure on April 9, 1973, and Harmer's postoperative recuperation was normal. The foregoing events had no direct bearing on the eventual malpractice claim, but they do serve to show the previous physician-patient relationship of Dr. Steward and Harmer.

The events giving rise to the underlying medical malpractice action began in early April 1974. At that time, Harmer consulted Dr. Steward explaining, because she had not had a menstrual period since February 7, 1974, that she believed she was pregnant. After performing a pelvic examination and conducting a pregnancy test, Dr. Steward failed to find any evidence of pregnancy. On May 3, 1974, Harmer returned to Dr. Steward's office because her menstrual cycle had still not returned and requested another pelvic examination. Dr. Steward conducted a second examination, and again he found no evidence of pregnancy. Harmer then requested Dr. Steward to perform a tubal ligation to sterilize her permanently. Dr. Steward agreed to her request and scheduled that surgery for May 23, 1974.

---

[2]While petitioner characterized his motion directed at Dr. Steward's second cause of action as one for summary judgment, he actually argued that Dr. Steward had no cause of action against him. In essence, "the motion has the purpose and effect of a general demurrer. [Citation.]" (*Goodley* v. *Wank & Wank, Inc.,* 62 Cal.App.3d 389, 392 [133 Cal.Rptr. 83].) Hence, "notwithstanding its nomenclature, [petitioner's motion for summary judgment] was nothing more than a motion for judgment on the pleadings. [Citation.]" (*Id.*)

At this juncture, a clear conflict in the facts enters the case. According to Harmer, on May 22, 1974, she went to Dr. Steward's office and again expressed "a real and growing concern" that she was pregnant. Harmer contends, in her declaration filed in support of her motion for summary judgment and relied upon by petitioner, that "I told Dr. Steward that I would like for him to do a D & C (dilation and curettage) procedure [in addition to the tubal ligation] to make sure that I was not pregnant." Harmer further stated that Dr. Steward responded that "he did not believe [she] was pregnant and that he did not want to perform a D & C . . . ."

Contrastingly, in his declaration opposing petitioner's motion for summary judgment, Dr. Steward recalled the May 22 conversation as follows: "Prior to the operation on May 23, 1974, Mrs. Harmer was given my patient information sheet; surgical consent and my routine steriliza-tion discussion form with a consent to be signed. She specifically requested of this declarant that I avoid any mention of pregnancy or amenorrhea on her history or physical examination or consent forms because if this occurred, her insurance company would not pay the bills. I assured her that this could not happen as there was no medical evidence whatsoever of a pregnancy. Mrs. Harmer then signed all the necessary forms. A dilation curettage (D&C) was not recommended, discussed, nor was it included on the operative [sic] forms or the informed consent forms because there was no indication for such a procedure. If Mrs. Harmer had been diagnosed pregnant and had wanted a therapeutic abortion performed at the time of the tubal ligation, this would have had to be requested in writing and the necessary permits and informed consent documents executed."

On May 23, 1974, Dr. Steward performed the tubal ligation, finding Harmer's uterus "to be in a neutral position, the upper limits of normal size, with no evidence of any pathology." Dr. Steward did not perform a D & C.

During the two months following that surgery Harmer began feeling "tired, irritable [and] run down." Moreover, her menstrual cycle did not return. On August 21, 1974, Harmer consulted Dr. Steward again, explaining her postoperative symptoms to him. Dr. Steward gave Harmer another pelvic examination and prescribed medicine to prompt a menstrual cycle. The prescription proved ineffective. Dr. Steward also suggested that Harmer see a psychologist and seek a second gynecolo-gist's opinion.

Harmer's condition continued to deteriorate, and by November she was experiencing severe abdominal cramps. At that time she consulted a second gynecologist, Dr. Rainey, and explained her symptoms and past medical history to him. Dr. Rainey, like Dr. Steward, gave Harmer an injection to induce her menstrual cycle which again was ineffective. He then scheduled her for a dilation and curettage to be performed on *November 14, 1974.*

The dilation and curettage was performed without complication. According to Harmer's discharge summary, during the dilation and curettage, Dr. Rainey removed "[a] large amount of tissue appearing to be an old pregnancy. . . ." In addition, the "pathology report did show products of conception." In other words, Harmer's belief that she was pregnant, communicated on numerous occasions to Dr. Steward proved to be correct. After undergoing the dilation and curettage performed by Dr. Rainey, Harmer's menstrual cycle returned.

Shortly after undergoing the dilation and curettage performed by Dr. Rainey, Harmer contacted Dr. Steward and told him the results of that surgery. According to Harmer, Dr. Steward said he believed the tubal ligation he had performed was successful and consequently she must have been pregnant *before* the surgery. To determine whether the tubal ligation had been successful, Dr. Steward recommended that Harmer undergo an X-ray procedure called a hystrosalpingography. Harmer consented to the test and its results indicated the tubal ligation had been properly performed. Thus, it was highly improbable if not impossible that Harmer became pregnant *after* that surgery. Harmer contends, when she met again with Dr. Steward after the X-ray results were known, that he stated "he guessed he had made a mistake [in not earlier diagnosing the pregnancy] and maybe he should do the D & C as routine in the future [when performing a tubal ligation]."

Dr. Steward, in his declaration, conceded that Dr. Rainey's findings noted above were correct but attempted to qualify that concession by stating that "[t]he pathology report showed 'calcified villi' which means that the patient had at some time previously been pregnant and that some of the elements of the . . . pregnancy . . . were still present and calcified." Dr. Steward further stated, however, that "[c]ontrary to the assertions by . . . Harmer, I never told her that I guessed I made a mistake or that maybe I should do a D & C routinely . . . . *I informed her that it appeared possibly that she was pregnant at the time the tubal ligation was done.*" (Italics added.)

On May 28, 1975, Harmer sent Dr. Steward a letter requesting $671.95 to pay for the doctor and hospital bills she incurred during the second D & C surgery performed by Dr. Rainey. In that letter Harmer advanced the following as the primary basis for her claim: "I realize the operation [tubal ligation] was not guaranteed, but I do feel you were extremely negligent in not performing a D & C at the time of the operation, since there was every possibility that I was preganat [sic] at the time. If you will recall, I asked you on the evening prior to surgery if you would do so, in order that everything would be alright [sic]. You stated you did not wish to do so. When I had had normal periods for a year and suddenly did not have any, (my last period being in January, 1974) it should have been apparent to you that something was wrong."

In response to Harmer's letter, Dr. Steward denied liability, requested she not contact him further, and directed her to discuss her claim with his lawyers.

The aforementioned facts comprise the basis of what Harmer perceived as a valid claim of medical malpractice against Dr. Steward. With those facts in hand, she consulted petitioner on *November 12, 1975.* According to petitioner, after Harmer related to him *all the facts,* as above noted, he advised Harmer that she had a legitimate claim for damages. Petitioner, in his supporting declaration, stated further that he believed, because Dr. Rainey performed the D & C on November 14, 1974, approximately one year earlier, that Harmer probably became aware that Dr. Steward had misdiagnosed her condition at that time, and that the one year statute of limitations for medical malpractice actions would therefore have run in just two days, i.e., on November 14, 1975.[3] Petitioner therefore drafted and filed a complaint for medical malpractice against Dr. Steward the very next day. However, a copy of that complaint was never served on Dr. Steward.

The following Monday, four days after filing the complaint, petitioner requested copies of all pertinent medical records from Dr. Steward, Dr. Rainey and the various hospitals involved. He received those records another four days thereafter and, after reviewing them, concluded that the facts, learned from Harmer and which he relied upon in drafting the complaint, were accurate. Ten days later, a representative of Traveler's Insurance Company, Dr. Steward's malpractice carrier, contacted peti-

---

[3]Code of Civil Procedure section 340.5 provided the relevant statute of limitations for medical malpractice actions: "[O]ne year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury. . . ."

tioner, even though Harmer's complaint had not been served on Dr. Steward. Dr. Steward had apparently become aware of the complaint filed against him and had voluntarily contacted Traveler's. As a result of the contact by the insurance company, petitioner notified Traveler's in late January 1976 that he had authority to settle the matter for $1,000. Eventually, on July 27, 1976, after its medical experts completed two reviews of the relevant medical reports, Traveler's advised petitioner that it found no liability on Dr. Steward's part and would not pay Harmer anything for release of her claim.

Between July 27 and August 27, 1976, petitioner discussed with Harmer the possibility of litigating her medical malpractice case against Dr. Steward. Specifically, petitioner told Harmer that he believed trial expenses would approximate $2,000-$3,000, including expert witness fees. Ultimately, Harmer decided that litigation against Dr. Steward for the small sum involved, $671.95, would not be economically feasible. She therefore dismissed the case with prejudice, after first having been substituted in propria persona for petitioner. Finally, according to their declarations, both Harmer and petitioner at all times believed the case against Dr. Steward had merit.

After Harmer dismissed her case, Dr. Steward filed a verified complaint against petitioner and Harmer alleging both malicious prosecution and negligence in bringing the earlier medical malpractice action. In that complaint Dr. Steward prayed that general and special damages be awarded according to proof and for $100,000 in exemplary damages.

After Dr. Steward's suit was at issue, Harmer and petitioner, as already noted, moved for summary judgment. Their motions were denied, and petitioner then instituted the current proceedings leading to our issuance of the alternative writ of mandate which now brings the matter before us for disposition.

## ISSUES AND DISCUSSION

Because the petitioner's motion in the trial court was directed at both counts of the complaint, we shall deal separately with the ruling challenged as it relates to each count. Moreover, for reasons of expositional clarity, we shall deal first with the issue raised by the trial court's ruling on the second count.

I

Dr. Steward's second count was pleaded only as to petitioner and charges him with *negligence* in filing Harmer's malpractice action. Dr. Steward and the California Medical Association (CMA), amicus curiae, urge that we create a new rule of law granting persons involved in litigation the right to sue their adversary's attorney for negligence when that attorney fails reasonably to investigate the facts and applicable law before filing a lawsuit. Specifically, Dr. Steward contends "that petitioner knowingly filed a frivooous [*sic*] and vexatious lawsuit against Dr. Marsh Steward; that petitioner owed a duty to the public and Dr. Steward in particular, to exercise reasonable care to investigate as to the merits and validity of the claim; that failing to investigate the merits of the claim and exercise reasonable care, Petitioner breached said duty; that there is a causal connection between Petitioner's conduct and the damages sustained by Dr. Steward which include cancellation of his malpractice insurance, resulting in severe financial burden; and, that the alleged damages were the proximate result of Petitioner's conduct."

As explained below, we reject the theory that attorneys owe a duty of care to adverse third parties in litigation. In our view, Dr. Steward's sole and adequate remedy is that provided by an action for malicious prosecution. Therefore, we hold Dr. Steward's claim of entitlement to a cause of action against petitioner for alleged negligence in filing a medical malpractice action to be without merit. (See fn. 2, *ante.*)

In support of his contention, Dr. Steward relies on a number of recent California Supreme Court decisions expanding the duty of care owed to third persons in particular factual situations. Most notably, he cites: *Tarasoff* v. *Regents of University of California,* 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; *Heyer* v. *Flaig,* 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161]; *Dillon* v. *Legg,* 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; and *Lucas* v. *Hamm,* 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685], cert. den. 368 U.S. 987 [7 L.Ed.2d 525, 82 S.Ct. 603]. In none of those cases was a duty of care imposed upon an attorney in favor of an *adverse third party.*

Moreover, those cases recognize that numerous policy considerations are involved in determining, on a "case-by-case basis" (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 740) whether a duty of care is owed to a foreseeable third party. Analysis of liability for negligence in terms of duty has been criticized as a question-begging process. The assertion that liability must

be denied because defendant bears no duty to plaintiff begs the essential question, i.e., whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. ■ Duty is a shorthand statement of a conclusion, rather than an aid to analysis in itself. But it should be recognized that duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. (See, e.g., *Commercial Standard Ins. Co.* v. *Bank of America,* 57 Cal.App.3d 241, 248 [129 Cal.Rptr. 91].) A cogent discussion of those policy considerations appears in *McGarvey* v. *Pacific Gas & Elec. Co.,* 18 Cal.App.3d 555 [95 Cal.Rptr. 894]: "No rigid rule can be stated defining when a duty of care owed by a specific defendant to plaintiff does or does not exist. Under modern law the following policy matters have been suggested as those the courts will consider and weigh: [1] foreseeability of harm to plaintiff, [2] degree of certainty of harm to plaintiff, [3] closeness of connection between defendant's conduct and injury suffered, [4] defendant's moral blameworthiness, [5] policy of preventing future harm, [6] the burden of imposing liability upon a defendant versus the consequences to the community if liability for breach is withheld, [7] the availability, cost and prevalence of insurance for the risk involved. [Citations.]" (*Id.,* at p. 561; see also *Goodman* v. *Kennedy,* 18 Cal.3d 335, 342 [134 Cal.Rptr. 375, 556 P.2d 737].)

As demonstrated below, California courts, in refusing to impose a duty of care owed by an attorney to an adverse third party, have recognized that "the burden of imposing liability upon a defendant" attorney outweighs "the consequences to the community if liability . . . is withheld." (*McGarvey* v. *Pacific Gas & Elec. Co., supra,* 18 Cal.App.3d 555, 561.) ■ In reaching this result, the decisions acknowledge that to impose such a duty would place an attorney in a position where his own interests would conflict directly with his client's interests. Accordingly, so the rationale runs, a person's right to effective assistance of counsel would be denigrated, simultaneously impairing that person's right of free access to the courts.

*Norton* v. *Hines,* 49 Cal.App.3d 917 [123 Cal.Rptr. 237], although not involving an initial medical malpractice suit, is the leading California decision expressly rejecting the proposition that an attorney owes a duty of care to adverse third parties in litigation. In *Norton,* an adverse third party, Norton, sued an attorney for negligence in advising another person to commence a lawsuit against him (Norton) for inducing a breach of contract. The defendant attorney's general demurrer to that claim was

sustained without leave to amend by the trial court and the appellate court affirmed that result.

On appeal, the plaintiff Norton claimed that " 'an attorney owe[s] a duty to a foreseen third person to exercise reasonable care in advising his client to commence a lawsuit against that third person. . . .' " (*Id.*, at p. 919.) Norton relied upon the decisions noted above, particularly *Lucas* v. *Hamm, supra,* 56 Cal.2d 583, and *Heyer* v. *Flaig, supra,* 70 Cal.2d 223, arguing that they provided clear legal support for his argument. After incisively analyzing those cases, the *Norton* court interpreted the rule of law they established as follows: " '[a]n attorney may be liable for damage caused by his negligence to a person *intended to be benefited by his performance* irrespective of any lack of privity of contract between the attorney and the party to be benefited. [Citation.] The liability sounds in tort.' (Italics added.) [Fn. omitted.]" (*Norton* v. *Hines, supra,* 49 Cal.App.3d 917, 921, citing *Donald* v. *Garry,* 19 Cal.App.3d 769, 771 [97 Cal.Rptr. 191, 45 A.L.R.3d 1177].)

Accordingly, the *Norton* court held that "[i]n the case at bar a former litigant is suing adverse counsel. *Clearly, an adverse party is not an intended beneficiary of the adverse counsel's client. If a cause of action exists against attorneys . . . it must be pleaded as an action for malicious prosecution.* We see no reason to extend applicable law now found in cases involving attorneys and third parties when there is sound and recognized public policy for limiting the cause of action to malicious prosecution. . . ." (*Norton* v. *Hines, supra,* 49 Cal.App.3d 917, 921, italics added.)

The *Norton* court placed great weight on the public policy of free access to the courts in refusing to impose a duty of care on the defendant attorney. "[T]he attorney owes a duty to his client to present his case vigorously in a manner as favorable to the client as the rules of law and professional ethics will permit. He is an advocate and an officer of the court. He is cognizant of the public policy that encourages his clients to solve their problems in a court of law. [Fn. omitted.]" (*Id.*, at p. 922.) "[I]f Norton's cause of action against attorneys for negligence [were] permitted, this policy [would] be subverted. *The attorney must have the same freedom in initiating his client's suit as the client. If he does not, lawsuits now justifiably commenced will be refused by attorneys, and the client, in most cases, will be denied his day in court.* [Fn. omitted.]" (*Id.*, at p. 923, italics added.)

While the California Supreme Court has not squarely confronted the issue present in *Norton*, it has, citing *Norton* with approval, considered the closely analogous issue of whether an attorney owes a duty of care to foreseeable third persons when advising his own client on the legal consequences of certain transactions with those third persons. (*Goodman* v. *Kennedy, supra,* 18 Cal.3d 335, 344-345, fn. 5.) In *Goodman,* plaintiffs sued their contractually legal adversaries' attorney for losses suffered when they purchased shares of stock from that defendant attorney's clients. The clients were principal officers of the corporation issuing the stock. Plaintiffs alleged defendant *negligently* advised his clients that the shares involved could be issued to them as stock dividends and sold to third parties (of which plaintiff turned out to be one) without jeopardizing a previously granted exemption from the requirement of registering the corporation's stock. In fact, the defendant attorney erred in giving that advice.

In *Goodman,* after considering the precedential relevance of *Lucas* v. *Hamm, supra,* 56 Cal.2d 583, and *Heyer* v. *Flaig, supra,* 70 Cal.2d 223, the California Supreme Court, like the *Norton* court, characterized those cases as *intended beneficiary cases,* and held: "The present defendant had no relationship to plaintiffs that would give rise to his owing plaintiffs any duty of care in advising his clients that they could sell the stock without adverse consequences. There is no allegation that the advice was ever communicated to plaintiffs and hence no basis for any claim that they relied upon it in purchasing or retaining the stock. [Fn. omitted.] Nor was the advice given for the purpose of enabling defendant's clients to discharge any obligation to plaintiffs. Thus, there is no allegation that plaintiffs had any relationship to defendant's clients or to the corporation as stockholders or otherwise when the advice was given." (*Goodman* v. *Kennedy, supra,* 18 Cal.3d 335, 343-344.)

In arriving at its holding, the Supreme Court reasoned in *Goodman* that "[i]nvoking the policy considerations upon which liability to putative will beneficiaries was recognized in . . . , *Lucas* and *Heyer, supra,* plaintiffs argue that defendant's advice was 'intended to affect' them as purchasers and that harm to them was foreseeable from the adverse effect of the sale upon the value of the stock contrary to the erroneous assurances embodied in the negligent advice. *However, plaintiffs were not persons upon whom defendant's clients had any wish or obligation to confer a benefit in the transaction. Plaintiffs' only relationship to the proposed transaction was that of parties with whom defendant's clients might negotiate a bargain at arm's length.* Any buyers' 'potential advantage' from the possible

purchase of the stock 'was only a collateral consideration of the transaction' [citation] and did not put such potential buyers into any relationship with defendant as 'intended beneficiaries' of his clients' anticipated sales [citation]." (*Goodman v. Kennedy, supra,* 18 Cal.3d 335, 344, italics added.)

■ We are in complete accord with the Supreme Court's observation that to impose such a duty would seriously jeopardize the attorney-client relationship: "To make an attorney liable for negligent confidential advice not only to the client who enters into a transaction in reliance upon the advice but also to the other parties to the transaction with whom the client deals at arm's length would inject undesirable self-protective reservations into the attorney's counselling role. The attorney's preoccupation or concern with the possibility of claims based on mere negligence (as distinct from fraud or malice) by any with whom his client might deal 'would prevent him from devoting his entire energies to his client's interests' [citation]. The result would be both 'an undue burden on the profession' [citation] and a diminution in the quality of the legal services received by the client. [Fn. omitted.] [Citation.]" (*Goodman v. Kennedy, supra,* 18 Cal.3d 335, 344.)

A fortiori, if an attorney owes no duty of care to foreseeable third parties with whom his client might deal in a nonlitigated, arm's length transaction, by no logical stretch of the imagination could such a duty arise in favor of adverse third parties in litigation.[4]

We note further that appellate courts in other jurisdictions have recently rejected the proposed extension of duty as advanced by Dr. Steward and the California Medical Association. (See, e.g., *Lyddon v. Shaw,* 56 Ill.App.3d 815 [372 N.E.2d 685]; *Spencer v. Burglass* (La.App. 1976) 337 So.2d 596; *Bickle v. Mackie* (N.D.Iowa 1978) 447 F.Supp. 1376; *Brody v. Ruby* (Iowa 1978) 267 N.W.2d 902; *Pantone v. Demos,* 59 Ill.App.3d 328 [375 N.E.2d 480]; *Berlin v. Nathan,* 64 Ill.App.3d 940 [381 N.E.2d 1367]; *Friedman v. Dozorc,* 83 Mich.App. 429 [268 N.W.2d 673]; *Drago v. Buonagurio,* 89 Misc.2d 171 [391 N.Y.S.2d 61].) Each of those decisions viewed the public policy of freedom of access to the courts as

---

[4] As one commentator notes, an accurate statement of the law of attorneys' liability to third parties after *Goodman* is that "[e]xcept in those isolated instances where the basic intent and purpose of the attorney's service is to create rights for specific third parties as in a will or trust, as to induce specific action on the part of third parties . . . his liability should be limited strictly to his client." (*The Supreme Court of California 1976-1977* (1978) 66 Cal.L.Rev. 393, 408, fn. 54, citing Haughey, *Lawyers' Malpractice: A Comparative Approach* (1973) 48 Notre Dame Law. 888, 896.)

clearly outweighing any argument favoring creation of a duty of care owed by attorneys to adverse third parties in litigation. Moreover, each decision recognized as an adequate remedy, the right of the adverse third party to sue the attorney for malicious prosecution. We view those cases as analytically sound and clearly supportive of the position we have taken with reference to what we see to be the California law on the issue.

## II

Turning to the first count of Dr. Steward's complaint, that for malicious prosecution, petitioner's general contention is that the trial court erred in denying his motion because Dr. Steward failed to demonstrate, in his counterdeclarations, the existence of triable issues of material fact. Accordingly, petitioner argues further that the trial court properly should have granted his motion as to count one with the result here that petitioner is entitled to a writ of mandate in terms appropriate to effect the relief sought.

However, petitioner, in his attack on the trial court's ruling, misconceives the nature of the respective showings necessary to prevail on a motion for summary judgment. More particularly, we note again that petitioner contends that the trial court erred because *Dr. Steward* failed to demonstrate by counter declarations the existence of triable issues of fact. This is not a complete view of the two-step decisional process to be followed in ruling on a motion for summary judgment.

■ Even before turning to the opposing party's declarations, the trial court must first carefully examine the declarations filed in support of the motion, strictly construing these against the moving party. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.,* 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) ■ "Summary judgment is proper *only* if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor. . . ." (*Id.,* at p. 417, italics added.) On the other point noted, summary judgment is "a drastic remedy eliminating trial and therefore the moving party's declarations must be strictly construed. . . ." (*Hepp* v. *Lockheed-California Co.,* 86 Cal.App.3d 714, 717 [150 Cal.Rptr. 408].)

With this the starting point in approaching a ruling on a motion for summary judgment, it is necessary in terms of the case before us, to identify the elements of a cause of action for malicious prosecution. ■ A concise statement of those elements is set forth in *Tool Research & Engineering Corp.* v. *Henigson,* 46 Cal.App.3d 675 [120 Cal.Rptr. 291]:

"[A] cause of action for malicious prosecution of a civil suit is dependent upon the existence of three elements: [1] the prior civil action must have terminated in [Dr. Steward's] favor; [2] [petitioner] must have lacked probable cause in representation of [his] client; and [3] [petitioner] must have acted maliciously. [Citations.]" (*Id.*, at p. 682.)

As to the first factor, *favorable termination,* the extrinsic facts are that Harmer, based in part on petitioner's advice, voluntarily dismissed with prejudice her medical malpractice action against Dr. Steward, seemingly because of the expense involved in litigating the case further. As already noted, Harmer originally demanded only $691.95 from Dr. Steward and later told petitioner that she would be willing to settle for $1,000. Alternatively, petitioner advised Harmer that attorney's fees, witness fees and court costs would amount to approximately $2,000-$3,000.

The California Supreme Court in *Jaffe* v. *Stone,* 18 Cal.2d 146 [114 P.2d 335, 135 A.L.R. 775], provides a thoughtful discussion on the meaning of favorable termination of a prior proceeding as it relates to a malicious prosecution action: "It is *not* enough, . . . to show that the proceeding was dismissed. The theory underlying the requirement of favorable termination *is that it tends to indicate the innocence of the accused, and coupled with the other elements of lack of probable cause and malice, establishes the tort,* that is, the malicious and unfounded charge of crime against an innocent person. . . . The same fundamental theory is applied in testing a dismissal or other termination without a complete trial on the merits. *If it is of such a nature as to indicate the innocence of the accused, it is a favorable termination sufficient to satisfy the requirement. If, however, the dismissal is on technical grounds, for procedural reasons, or for any other reason not inconsistent with his guilt, it does not constitute a favorable termination.*" (*Id.*, at p. 150, italics added.)[5]

Clearly, then, a defense verdict or a dismissal on the merits equates with a favorable termination and thus establishes the first element of a malicious prosecution case. Similarly, a favorable termination arises from a dismissal for failure to prosecute under Code of Civil Procedure section 583, subdivision (a). (*Minasian* v. *Sapse,* 80 Cal.App.3d 823, 827 [145 Cal.Rptr. 829].) Contrastingly, however, when a dismissal results from negotiation, settlement, or consent, a favorable termination is

---

[5]"Although the original proceeding in *Jaffe* was criminal, the *gist* of the statement is equally applicable to cases, like the one at bench, where the main action is civil." (*Babb* v. *Superior Court,* 3 Cal.3d 841, 846 [92 Cal.Rptr. 179, 479 P.2d 379], italics added.)

normally not recognized. (See, *Webb* v. *Youmans,* 248 Cal.App.2d 851, 853 [57 Cal.Rptr. 11].) Under these latter circumstances, the dismissal reflects ambiguously on the merits of the action. (*Minasian* v. *Sapse, supra,* 80 Cal.App.3d 823, 827, fn. 4, citing Prosser, Law of Torts (4th ed. 1971) § 119, p. 840.)

In *MacDonald* v. *Joslyn,* 275 Cal.App.2d 282 [79 Cal.Rptr. 707, 35 A.L.R.3d 641], however, the court in affirming a plaintiff's judgment in a malicious prosecution case, squarely held that "[a] *voluntary dismissal* of a civil action or proceeding by the plaintiff . . . *is not* ordinarily considered a dismissal 'on technical grounds' . . . . Such a voluntary dismissal, though expressly made '*without prejudice,*' is a *favorable termination* which will support an action for malicious prosecution. [Citations.]" (*Id.,* at p. 289, italics added.)[6]

In its opinion, however, the *MacDonald* court failed to consider whether the underlying reasons for which a defendant voluntarily abandons the earlier suit were relevant in attempting to equate the voluntary abandonment with a favorable termination. That question was recently addressed and answered in *Minasian* v. *Sapse, supra,* 80 Cal.App.3d 823, where the court held that dismissal for failure to prosecute constitutes favorable termination: "Undoubtedly *the failure to prosecute may occasionally be attributable to other than a complainant's implicit concession as to the merits of the action.* But it is impossible to see how, at least at the pleading stage, the one complaining of the malicious prosecution can do more than to allege the fact that an action was brought against him and subsequently dismissed because it was not pursued. *Should a conflict arise as to the circumstances explaining the failure to prosecute, the trier of fact must exercise its traditional role in deciding the conflict.* [Citations.]" (*Id.,* at p. 828, italics added.)

We believe the rationale of that latter rule must logically apply in assessing petitioner's argument that Harmer's voluntary dismissal with prejudice did not result in a favorable termination. As a consequence, the fact of whether Harmer lacked the financial ability to pursue the litigation and the operational effect of that circumstance on any attempt to equate her voluntary dismissal with prejudice to an unfavorable termination as urged by petitioner, is a question of fact for the jury to decide. Stated otherwise, based solely on the showing made by petitioner

---

[6]Dr. Steward's contention that Harmer's voluntary dismissal should be characterized as a favorable termination is even more compelling here because Harmer dismissed *with prejudice.*

in support of his motion, i.e., the attempt to show termination of the prior action unfavorably to Dr. Steward, the facts such as were offered by petitioner are ambiguous, and, under the *Minasian* rule noted, are therefore not an adequate predicate for a summary judgment. It is even arguable on these facts, under *MacDonald* v. *Joslyn, supra,* 275 Cal.App.2d 282, 289, that there was a termination favorable to Dr. Steward. Either way, as a consequence, petitioner, by means of *his* supporting declarations which we must strictly construe against him, failed to make a prima facie showing of unfavorable termination of the malpractice action.

Because the moving party, by his own supporting declaration, is required to provide a prima facie factual basis to justify a summary judgment in his favor (*Stationers Corp.* v. *Dun & Bradstreet, Inc., supra,* 62 Cal.2d 412, 417), if Dr. Steward's action were a one-issue effort, we would have, by the foregoing, demonstrated petitioner's failure to show entitlement to summary judgment on the second count. However, because Dr. Steward's count for malicious prosecution requires that *he* establish, in addition to a favorable termination, the presence of malice and a lack of probable cause in order to succeed in the main action, we must therefore consider further what the supporting and opposing declarations show by way of triable issues of fact regarding these additional elements. Accordingly, we proceed to an analysis of the showings made for and against the absence of probable cause and the presence of malice as elements of an action for malicious prosecution, these as previously noted in *Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d 675, 682.)

The papers filed by petitioner in support of the motion for summary judgment were somewhat unusual. Under the heading of "Memorandum of Points and Authorities" petitioner included a tabulation of "key facts" which ran on for about four pages. Then followed an extensive citation and discussion of legal authorities subscribed by the attorneys for petitioner. Then on "page 26" of the filing, petitioner subscribed a one-page declaration under penalty of perjury which, among other things, stated "[e]ach of the facts set forth in the within Declaration is within my direct, personal knowledge and, if called to testify as a witness, I could and would competently testify as to each such action. [¶] I have read the facts set forth in the Introduction to the within Motion at Page 3, Line 14 through and including Page 7, Line 1 and incorporate such facts herein by reference, as though set forth at length."

Much of the factual material related in the referred-to portions of the document here under discussion occurred *after* the complaint was filed. However, paragraph 1 stated, "Mrs. Barbara Harmer first consulted this moving defendant a sole practitioner, on November 12, 1975—two days before the last possible date within which to file a complaint or be barred by the statute of limitations. The complaint was filed on Thursday, November 13, 1975."

Several pages later, the referenced material stated, "[i]n the initial interview, two days before the statute of limitations would run, MRS. HARMER related the following facts:" Then there followed five paragraphs recounting what we have already set forth in our synopsis of the facts involving Harmer's contacts with Dr. Steward and the eventual procedure performed by Dr. Rainey.

Thereafter, the recitals in the referenced material stated, "[a]ll of the foregoing facts cannot be disputed. Indeed, the medical records confirmed that the facts related to this moving defendant by MRS. HARMER were remarkably accurate. And the conduct of counsel with respect to these facts was fully consonant with the highest traditions, ethics and duties of the profession."

Dr. Steward, in his declaration opposing petitioner's summary judgment motion, pointed solely to the following as raising a triable issue of material fact concerning the existence of malice: "That in initiating [this] action, defendants did not honestly, reasonably or in good faith believe a valid cause of action existed against plaintiff, and there was no prior investigation of facts prior to filing the lawsuit. . . . I *believe* that the prior lawsuit was filed for the purpose of forming [*sic*] a settlement which had no relation to the merits of the claim; for the purpose of pressuring this declarant into paying certain medical expenses allegedly incurred by Barbara Harmer; and that neither Mrs. Harmer nor Thomas Weaver had an honest and sincere belief that such action was valid." (Italics added.)

In our view, Dr. Steward's statement attempting thus to import malice is no more than speculation unsupported by any factual reference. Therefore, in and of itself, it is only a conclusion of ultimate fact which fails to raise a triable issue of material fact on this element of the main action. (See, e.g., *de Echeguren* v. *de Echeguren,* 210 Cal.App.2d 141, 148 [26 Cal.Rptr. 562].)

We further note, however, that regardless of the absence of malice in the form of actually demonstrated ill will or bad faith, courts uniformly permit malice in malicious prosecution actions to be inferred from a want of probable cause. (*Singleton* v. *Singleton*, 68 Cal.App.2d 681, 696 [157 P.2d 886].) As one commentator indicates, "[r]egardless of the theory on which a court relies to find malice, a close factual analysis of the cases suggests that malice is almost always found from the same facts as those which establish lack of probable cause." (Comment, *Attorney Liability for Malicious Prosecution and Legal Malpractice: Do They Overlap?* 8 Pacific L.J. 897, 904, fn. omitted.)

The question of whether an attorney has *probable cause* to represent a client in a lawsuit was recently addressed in *Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d 675. In that decision Justice Thompson stated "[i]t is the attorney's *reasonable and honest belief* that his client has a *tenable claim* that is the attorney's probable cause for representation [citations], and not the attorney's *conviction* that his client must prevail. . . . So long as the attorney does not abuse that duty by prosecuting a claim which a reasonable lawyer would not regard as tenable or by *unreasonably neglecting* to investigate the facts and law in making his determination to proceed, his client's adversary has no right to assert malicious prosecution against the attorney if the lawyer's efforts prove unsuccessful." (*Id.,* at pp. 683-684, italics added.)

Petitioner argues that the proper interpretation of the standard for determining probable cause posited in *Tool Research* is "that the meaning of 'reasonable' in any given case must be construed in light of the existing facts and circumstances." Here, petitioner, a sole practitioner, according to his interpretation of the facts, was faced with a statute of limitations that would run in two days. He asserts that his belief was that no extensions of time could be obtained and failure to file would be totally inexcusable. Stated otherwise, petitioner contends, because he reasonably believed the statute of limitations applicable to Harmer's action would run in just two days, that he was entitled to rely on Harmer's recitation of the facts, and then to draft and file a complaint based on those facts so as to prevent the statute from running. Under those circumstances, according to petitioner, we can hold as a matter of law that he had probable cause to file the action. Accordingly, if we hold that probable cause existed, then Dr. Steward's malicious prosecution action must fail.

■ Alternatively, Dr. Steward contends that whether petitioner acted reasonably in filing Harmer's action is a question of fact. Furthermore, he argues that petitioner acted unreasonably in failing to investigate the facts before filing the complaint because the statute of limitations would not have run on November 14, but at a later date. Otherwise, Dr. Steward states, citing *Wozniak* v. *Peninsula Hospital,* 1 Cal.App.3d 716 [82 Cal.Rptr. 84], that "[t]he question of when there has been a belated discovery of the cause of action, especially in malpractice cases, is essentially a question of fact." (*Id.,* at p. 725.) Therefore, Dr. Steward argues, because the presence of the elements of probable cause and malice remained unresolved issues of fact, the petitioner was not entitled to summary judgment.

How then was the trial judge to resolve these opposing contentions? We turn again for guidance to Justice Thompson's opinion in *Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d 675.

■ He observes that "[r]esolution of the question of the existence of a triable issue of fact on the question of probable cause requires the isolation of the factual and legal elements of probable cause itself. *The trier of fact must resolve any conflict in the evidentiary underpinning of the facts of probable cause.* Once that conflict has been resolved, the question of whether the facts as they are found to exist constitute probable cause for bringing the former action is a question of law to be resolved by the judge. [Citations.]" (*Id.,* at pp. 682-683, italics added.) Similarly, as noted in *Davis* v. *Local Union No. 11, Internat. etc. of Elec. Workers,* 16 Cal.App.3d 686 [94 Cal.Rptr. 562], "[a]t the outset, it is not quite correct for the Union [petitioner] to assert that . . . probable cause is not a jury question but one for the court to decide as a matter of law . . . but . . . the question must be determined by the court (as a matter of law) *only when there is no dispute concerning the existence of the facts relied on to establish this particular element of the tort . . . .*" (*Id.,* at p. 692; italics added.)

■ Applying the foregoing to the case before us, what remain as unresolved issues of fact are whether petitioner's belief that the statute was about to run was *reasonable* and whether the investigation of the facts and law leading to that conclusion were also *reasonable.* While probable cause is finally an issue of law, the question of whether given conduct is reasonable is always one of fact. Fairly read, the filings for and against petitioner's motion did not contest any *extrinsic fact*; there was no dispute over what actually happened in terms of who said and who did what. The

dispute arose over what interpretation was to be placed on what happened. With this the posture of the matter, these undisputed extrinsic facts gave rise to the possibility of conflicting inferences, i.e., reasonable versus unreasonable. As such the case could not properly have been disposed of by means of summary judgment. (Code Civ. Proc., § 437c; *Bispo* v. *Burton,* 82 Cal.App.3d 824, 832 [147 Cal.Rptr. 442].) Accordingly, the trial court correctly denied petitioner's motion as to the first count.

Otherwise, whenever the dispute is over an ultimate fact of a highly subjective nature, e.g., reasonableness of behavior, requiring for its resolution a full and complete demonstration of all relevant extrinsic events, an appellate court will rarely mandate the trial court to vacate its ruling denying a party's motion for summary judgment when there has been no discovery, as in the case at bench.

We say this advisedly because Code of Civil Procedure section 437c provides in pertinent part that "[i]f it appears from the affidavits submitted in opposition . . . that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion. . . ." In our view, Dr. Steward has implied that facts may exist which would provide a meritable opposition to petitioner's motion for summary judgment on the issue of probable cause. This possibility exists on the question of whether petitioner's conclusion regarding when the statute was to run was really as obvious as petitioner argues that it was. Whether those facts do exist, however, cannot be fairly established until some discovery has taken place and, as just noted, no discovery has been conducted in the case at bench. As a consequence, with essential facts required to oppose petitioner's motion potentially existing, it is our view that on this alternative ground the trial court did not abuse its discretion in denying petitioner's motion for summary judgment as to the first count.

## DISPOSITION

Let a peremptory writ of mandate issue directing the Superior Court of Orange County to vacate its order of January 17, 1979, and further directing said court to enter a new and different order therein denying the defendant Weaver's motion as to the first count of plaintiff's complaint and striking the second count thereof.

All parties shall bear their own costs.

Gardner, P. J., and Morris, J., concurred.

A petition for a rehearing was denied on July 23, 1979, and the following opinion was then rendered:

McDANIEL, J.—After our initial opinion had been filed herein, petitioner filed a petition for rehearing. Therein petitioner contends that we have "inadvertently engrafted negligence concepts onto the definition of 'probable cause' in a malicious prosecution context" because of our adherence to the probable cause definition articulated in *Tool Research & Engineering Corp.* v. *Henigson,* 46 Cal.App.3d 675 [120 Cal.Rptr. 291]. As explained in our opinion, *Tool Research* holds, as against a claim of malicious prosecution, that "[a]n attorney has probable cause to represent a client in litigation when, after a *reasonable investigation* and industrious search of legal authority, he has an honest belief that his client's claim is tenable . . . . [Citation.]" (*Id.,* at p. 683, italics added.)

Petitioner arguest that by following the *Tool Research* standard we have "made liability for 'negligence' and liability for 'malicious prosecution' virtually indistinguishable," apparently because a component common to both determinations is proof that a defendant acted unreasonably. Therefore, petitioner urges that we grant a rehearing because we have reasoned inconsistently in holding petitioner is entitled to summary judgment on Dr. Steward's negligence claim, yet not entitled to such relief on Dr. Steward's claim for malicious prosecution. Petitioner's confusion deserves further commentary on the difference between the torts of negligence and malicious prosecution.

■ A threshold determination in assessing the validity of any plaintiff's claim sounding in negligence is the legal policy conclusion that a *duty of care* is extant. (See, e.g., *McGarvey* v. *Pacific Gas & Elec. Co.,* 18 Cal.App.3d 555, 561-562 [95 Cal.Rptr. 894].) The assessment of whether a person's behavior is reasonable or unreasonable is of course relevant in ascertaining whether a preexisting duty has been breached. However, absent the presence of duty, a person's unreasonable behavior resulting in injury imposes no liability for negligence, i.e., failing to adhere to the reasonable person standard is inconsequential where no duty is owed by a careless party to an injured party. (See, e.g., 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 489, p. 2750.)

In section I of our opinion we held as a policy matter that petitioner-attorney owed no duty to Dr. Steward to conduct a reasonable investigation into the facts and law before filing a complaint for medical malpractice on behalf of Harmer. Accordingly, even assuming arguendo that petitioner unreasonably failed to investigate the facts and law before proceeding with Harmer's litigation, Dr. Steward could assert no negligence cause of action against petitioner as a matter of law. (See fn. 2, p. 173.)

Contrastingly, in section II we held that triable issues of material fact existed as to Dr. Steward's malicious prosecution claim against petitioner. We therefore refrained from issuing a writ of mandate to the trial court ordering it to enter summary judgment in petitioner's favor. Implicit in that decision, was the legal evaluation that Dr. Steward could properly proceed with a cause of action against petitioner predicated on the tort of malicious prosecution.

■ The propriety of a cause of action for malicious prosecution against an attorney, unlike a cause of action sounding in negligence, is not based on the legal question of whether a duty of care exists and has been breached. Rather, a malicious prosecution cause of action is bottomed on the allegation and proof of the following three factors: (1) the prior civil action against the plaintiff must have terminated in the plaintiff's favor; (2) a defendant-attorney must have lacked probable cause in representation of his client in the prior action; and (3) the defendant-attorney *must have acted maliciously therein. (Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d 675, 682.) If the plaintiff fails to sustain the burden of proof in demonstrating the existence of any one of these three factors, the plaintiff loses. Hence, the fact that a jury, for example, decides a defendant-attorney unreasonably failed to investigate the facts and law before proceeding with a lawsuit, thereby permitting the trial court to decide as a matter of law lack of probable cause (see, e.g., *Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d 675, 683), does not as such result in a plaintiff's judgment absent establishing the other two factors.

■ It is here that we perceive the locus of petitioner's confusion. What is reasonable and what is unreasonable in terms of the attorney's prefiling investigation is a question of fact; the legal determination of probable cause or the lack of it arises from whatever is found on the factual issues. As noted in our initial opinion, the third element of a malicious prosecution action, i.e., malice, is often inferred from the

factual predicate underlying the determination of a lack of probable cause. (*Singleton* v. *Singleton,* 68 Cal.App.2d 681, 696 [157 P.2d 886].) However, this result is *not* automatic. To complete proof of malicious prosecution, the presence of malice must be found as a matter of fact. As a consequence, it always remains a *possibility* that unreasonable behavior in terms of the nature of the prefiling behavior of the attorney, even though it would support a conclusion that there was no probable cause to file, would nevertheless *not* support an inference of malice. Actually, the facts of this particular case, when it is tried, if special interrogatories to the jury are carefully drawn, may well present such a result. Thus, in a given case, unreasonable behavior which could lead to a determination that there was a lack of probable cause to file, might not provide a sufficient basis to infer malice, and without malice no case of malicious prosecution can be proved.

Alternatively, assuming we had held that an attorney owed a duty of care to adverse third parties in litigation to investigate reasonably the facts and law before filing a complaint, if a jury found that the attorney breached that duty by acting unreasonably in failing adequately to investigate, the plaintiff would prevail.[1] It follows, therefore, that the quantum of culpable conduct which must be proved to prevail as a plaintiff in a malicious prosecution case is *significantly greater* than that required to prevail in a case alleging only negligence. For this reason we have concluded that petitioner's contention that our decision makes liability for negligence and malicious prosecution "virtually indistinguishable" is actually specious and hence without merit.

The petition for rehearing is denied.

Gardner, P. J., and Morris, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied September 12, 1979.

---

[1]This conclusion assumes, of course, the existence of causation in fact, proximate causation and damage. (See, e.g., 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 488, p. 2749 and cases cited therein.)