**CREDIT GENERAL INSURANCE COMPANY, Plaintiff,**

v.

**MIDWEST INDEMNITY CORPORATION, Defendant.**

**MIDWEST INDEMNITY CORPORATION, Third–Party Plaintiff,**

v.

**ANDERSON, McPHARLIN & CONNERS, a California Partnership, G. Wayne Murphy, an individual; and Larry E. Robinson, Third–Party Defendants.**

No. 90 C 7151.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 9, 1995.

Terrence Patrick Canade, Nick J. DiGiovanni, Lord, Bissell & Brook, Chicago, IL, C. Joseph Yast, Law Office of C. Joseph Yast, Northfield, IL, for Credit Gen. Ins. Co.

Stuart Michael Widman, Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Raymond Eugene Stachnik, Linda L. Cashmore, Amy E. Smith, Richard M. Seligman, James M. Witz, Katten, Muchin & Zavis, Chicago, IL, Steven M. Shape, Skokie, IL, for Midwest Indem. Corp.

Brian Thomas Fogelberg, Parrillo, Weiss & O'Halloran, Steven P. Rouse, Perry C. Rocco, Menges, Mikus & Molzahn, Chicago, IL, for Anderson, McPharlin & Conners, G. Wayne Murphy, a Professional Corp., and Larry E. Robinson.

## *MEMORANDUM OPINION AND ORDER*

ANN CLAIRE WILLIAMS, District Judge.

Defendant Midwest Indemnity Corporation ("Midwest") has brought a third-party suit against Anderson, McPharlin & Conners ("AMC"), G. Wayne Murphy, and Larry E. Robinson[1] for damages arising from their alleged legal malpractice in a California civil action ("Jones Bros. litigation"). This matter is before the court on third-party defendants' motion to dismiss for lack of standing and failure to file suit within the applicable statute of limitations. For the reasons stated below, the motion is denied.

### *Background*

■ This case arises out of a dispute between plaintiff Credit General Insurance Company ("Credit General") and Midwest, its former surety bond agent. In April 1984, Credit General and Midwest entered into a Limited General Agency Agreement ("LGA"). The LGA authorized Midwest to solicit, underwrite, and issue contracts of suretyship on behalf of Credit General. A

---

1. Murphy and Robinson are attorneys in the law firm AMC. These three will be referred to collectively as "AMC defendants" or "third-party defendants."

suretyship contract or surety bond is essentially an agreement to satisfy the contractual obligations of another party. *See Black's Law Dictionary* 1442 (6th ed. 1990). Under the LGA, Midwest agreed to indemnify Credit General from any losses or expenses associated with these bonds which were incurred as a result of negligent or intentional actions, errors, or omissions on its part, excluding any losses caused by Credit General's own misconduct.

Much of the dispute between Credit General and Midwest centers around one bond (the "W.S. Lee bond") issued by Midwest, and guaranteeing the contractual performance of W.S. Lee Construction Co. as a subcontractor to Jones Brothers Construction Co. ("Jones Bros."). The W.S. Lee bond was executed pursuant to fronting agreement between Indiana Lumbermens Mutual Insurance Company ("Indiana Lumbermens") and Credit General. Under this "fronting agreement," Indiana Lumbermens agreed to issue surety bonds to Credit General customers. Although these bonds purportedly committed Indiana Lumbermens, under the terms of the fronting agreement, Credit General indemnified and held Indiana Lumbermens harmless from any losses and expenses associated with the issuance of these bonds.

Unfortunately for all concerned, W.S. Lee was unable to fulfill its contractual obligations. Jones Bros., as obligees under the bond, subsequently brought suit in California to enforce the bond, seeking the penal sum of the W.S. Lee bond plus damages for the alleged bad faith handling of the company's claim. Although the California suit was brought against Indiana Lumbermens, Credit General directed the litigation, retaining AMC, a California law firm, as counsel. Credit General allegedly informed AMC at this time that it had a contractual obligation to indemnify Indiana Lumbermens for legal expenses incurred and any judgment awarded in the Jones Bros. litigation, and that Credit General, in turn expected Midwest to indemnify it for any sums Credit General was required to pay as a result of the litigation.

Things went badly in California. Midwest alleges that as a result of the negligence of the third party defendants, a $4.7 million jury verdict was returned against Indiana Lumbermens. Midwest's complaint cites the following acts (or failures to act) in support of its legal malpractice claim: (1) failure to advise Credit General or Midwest of the nature and risks of the Jones Bros. litigation; (2) failure to minimize the potential for direct exposure to losses; (3) failure to advise Credit General or Midwest of the danger that potential liability exceeded the amount Jones Bros. was willing to accept as a settlement; (4) failure to provide accurate information or well-founded legal opinions upon which Credit General or Midwest could weigh the merits of settling versus litigating; and (5) offering legal advice and opinions which they knew or should have known were contrary to controlling law. Midwest estimates that with attorney's fees and costs, the actual judgment could have exceeded $7 million. However, prior to the entry of judgment, Indiana Lumbermens settled the case with Jones Bros. for $3.65 million.

Following the settlement, Indiana Lumbermens initiated an arbitration proceeding against Credit General to recover the loss. Credit General and Indiana Lumbermens ultimately settled their dispute over the scope of Credit General's indemnification obligation for $2.85 million. In July 1993, Credit General obtained leave from this court to amend its complaint against Midwest to seek recovery of the $2.85 million payment to Indiana Lumbermens plus an additional $1 million in loss adjustment expenses.[2] Approximately six months later, on January 7, 1994, Midwest filed its third-party complaint against AMC, Murphy and Robinson.

### Discussion

#### A. *Standing*

■ Midwest is not now, nor has it ever been, a client of AMC. Under the traditional privity of contract rule, this fact alone would bar the instant suit. *See* Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* §§ 7.1–7.8 (3d ed. 1989). The modern trend, however, is to recognize the existence of a duty

---

**2.** Credit General filed its original complaint against Midwest in December 1990.

owed by attorneys to non-clients in a variety of circumstances. Beginning with its supreme court's decision in *Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16 (1958), California has been at the forefront of this movement.[3]

*Biakanja* involved a notary public who performed unauthorized legal services in preparing a will for a client. The will was subsequently invalidated for lack of a proper attestation clause. *Id.* 320 P.2d at 17. In holding that a beneficiary under the will could sue the notary for negligence, the court stated that a duty to a non-client could be found as a matter of public policy upon a balancing of the following six factors:

(1) the extent to which the transaction was intended to affect the plaintiff;

(2) the foreseeability of harm;

(3) the degree of certainty that the plaintiff suffered injury;

(4) the closeness of the connection between the defendant's conduct and the injury suffered;

(5) the moral blame attached to the defendant's conduct; and

(6) the policy of preventing future harm.

*Id.* 320 P.2d at 19.

In *Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961), the California supreme court applied this same rationale to a case involving an actual attorney and a beneficiary named in a negligently drawn will. The court restated the *Biakanja* test, but replaced the moral blame element with an inquiry into whether expansion of liability to the non-client would place an undue burden on the legal profession. *Id.* 15 Cal.Rptr. at 824, 364 P.2d at 688. In the more than thirty years since *Lucas*, California courts have continued to balance these same six factors in determining whether non-clients have standing to hold attorneys liable for malpractice in a variety of contexts. *See, e.g., Burger v. Pond*, 224 Cal.App.3d 597, 273 Cal.Rptr. 709 (1990) (suit by fiancee of defendant's client in divorce matter); *Fox v. Pollack*, 181 Cal.App.3d 954, 226 Cal.Rptr. 532 (1986) (suit by opposing party in real estate

transaction); *Donald v. Garry*, 19 Cal.App.3d 769, 97 Cal.Rptr. 191 (1971) (suit by creditor against attorney hired by a collection agency to collect plaintiff's debt); *Roberts v. Ball, Hunt, Brown & Baerwitz*, 57 Cal.App.3d 104, 128 Cal.Rptr. 901 (1976) (suit against attorney for providing his client with misleading information that was passed on to third party lender). In applying these factors to the case at hand, the court finds that Midwest does have standing to sue third-party defendants for legal malpractice.

As defendants readily point out, the primary purpose of AMC's retention was not to *benefit* Midwest. Credit General hired AMC, quite simply, to benefit Indiana Lumbermens and in turn, Credit General itself. However, unlike the contract beneficiary theory employed in other jurisdictions, California's test for standing in attorney malpractice cases encompasses not only intended beneficiaries, but also those parties who were intended to be *affected* by the attorney's services. Having been informed that Midwest had promised to partially indemnify Credit General for any losses flowing from the failed W.S. Lee Bond, there can be no doubt that AMC was retained with the understanding that the quality of its representation would have a significant adverse *effect* on Midwest. At the very least, the intended result of the transaction was to have a direct effect on Midwest's potential liability.

Looking to the second factor, it is equally clear that the adverse consequences to Midwest were reasonably foreseeable. As noted above, Midwest has alleged that third-party defendants were advised of the various indemnification agreements between Lumbermens, Credit General and Midwest that related to the outcome of the Jones Brothers Litigation. (Third-party Complaint ¶ 9). Under these circumstances, AMC must have known that any negligent representation on its part resulting in a large judgment against Indiana Lumbermens would eventually impact Midwest as well. Numerous California courts have held that, absent countervailing

---

**3.** The parties agree that California law governs the question of Midwest's standing to sue third-party defendants.

policy considerations, this factor—the fore-seeability of harm towards non-clients—can be dispositive. *See Schick v. Lerner,* 193 Cal.App.3d 1321, 1330, 238 Cal.Rptr. 902 (1987) ("imposition of a duty of professional care toward third persons generally has been limited to those situations wherein the non-client was an intended beneficiary ... or where the foreseeability of harm to the non-client as a consequence of professional negli-gence was not outweighed by other policy considerations").

The next two factors in the *Lucas* balanc-ing test, certainty of damages and proximity are also met. As already noted, Credit Gen-eral amended its complaint against Midwest to specifically include its payment to Indiana Lumbermens as a result of the Jones Broth-ers litigation. In terms of factor six, further-ing California's policy of preventing future harm, the court agrees with Midwest that this goal would be best served by allowing Midwest to proceed with its suit against third-party defendants. If Credit General were to prevail in its suit against Midwest to recover the damages resulting from the Jones Brothers litigation, neither it nor Indiana Lumbermens could pursue the AMC defendants for the full amount of damages caused by the alleged malpractice. Unless Midwest were found to have standing, the AMC defendants would be able to avoid full responsibility for their alleged wrongdoing. California's policy in favor of preventing fu-ture harm, in this case legal malpractice, would be best served by allowing Midwest to sue to recover any losses it suffered as a result of the AMC defendants' alleged negli-gence.

Third-party defendants argue that even if a balancing of the other *Lucas* factors weigh in favor of a finding of standing, Midwest's claim must still fall because Credit General and Midwest have adverse interests. As the AMC defendants correctly note, California courts have consistently rejected the notion that attorneys can owe separate duties to adverse third parties. *See Schick,* 193 Cal. App.3d at 1331, 238 Cal.Rptr. 902 (citing *Weaver v. Superior Court,* 95 Cal.App.3d 166, 179, 156 Cal.Rptr. 745 (1979); *Pollack,* 181 Cal.App.3d at 961, 226 Cal.Rptr. 532 (and

cases cited therein)). As the court in *Pollack* explained, imposition of such a duty would necessarily weaken the attorney-client rela-tionship, create conflicts of interest for attor-neys, and place an undue burden on the profession. *Id.* at 962, 226 Cal.Rptr. 532.

This being said, the court finds that for purposes of the Jones Brothers litigation, the interests of Indiana Lumbermens, Credit General and Midwest were all perfectly aligned. As noted above, each party was potentially liable for any judgment in favor of Jones Brothers. Each of them stood only to gain if the AMC defendants' efforts were successful and only to lose if the AMC defen-dants were unsuccessful or acted negligently. Under these circumstances, the mere fact that Credit General, Midwest and Indiana Lumbermens have disagreed over each par-ty's respective share of any judgment or settlement entered against Indiana Lumber-mens is of little relevance. Because the AMC defendants have never represented any of the parties in their separate disputes among themselves, no impermissible conflict of interest would be created, nor would the legal profession in California be unduly bur-dened, by extending AMC's duty of care to Midwest.

Having reviewed the various factors con-sidered by California courts when determin-ing the scope of an attorney's malpractice liability to non-clients, the court finds that Midwest has standing to maintain this suit.

### B. *Statute of Limitations*

The parties agree that the Illinois statute of limitations for legal malpractice governs their dispute. Effective January 1, 1991, the Illinois legislature amended the applicable statute of limitations, reducing the period within which suit must be filed from five to two years. The current statute provides:

(b) An action for damages based on tort, contract, or otherwise (i) against an attor-ney arising out of an act or omission in the performance of professional services ... *must be commenced within 2 years from the time the person bringing the action*

*knew or reasonably should have known of the injury for which damages are sought.*

735 ILCS 5/13–214.3.

The parties disagree over when the "injury for which damages are sought" first occurred. According to third-party defendants, the applicable injury occurred when the jury rendered its verdict in the Jones Brothers litigation in June 1991. Under this theory, Midwest's third-party complaint, filed in January 1994, must be dismissed because more than two years would have elapsed from the accrual of the cause of action. Midwest argues that it did not suffer any injuries, and thus the "injury for which damages are sought" did not occur, until July 1993 when Credit General amended its complaint against Midwest to recover the damages it had suffered as a result of the AMC defendants' alleged negligence. Under this approach, only six months would have elapsed from the accrual of Midwest's cause of action and its filing of the third-party complaint. Finding that Midwest did not suffer any injuries for which damages could be sought until Credit General amended its complaint in July 1993, the court denies third-party defendants' motion to dismiss.

In support of their position, third-party defendants cite *Zupan v. Berman,* 142 Ill. App.3d 396, 96 Ill.Dec. 889, 491 N.E.2d 1349 (1986). Zupan had sued her former attorney for malpractice allegedly committed during a dram shop action brought against the plaintiff in the circuit court of Cook County. Plaintiff had lost at trial and judgment was entered against her in the amount of $23,600. In affirming the dismissal of the malpractice action, the court held that the statute of limitations on Zupan's cause of action arose, and the limitations period commenced to run, on the date judgment was entered, more than five years earlier.[4] *Id.* 96 Ill.Dec. at 892, 491 N.E.2d at 1352. The court reasoned that at that point in time, Zupan had been injured by her attorney's allegedly negligent conduct and was aware or at least should have been aware of the injury. *Id.*

Here, unlike Zupan, Midwest was not injured at the time judgment was entered following trial. Although once judgment was entered against Indiana Lumbermens, Midwest was surely aware that a demand for reimbursement from Credit General was imminent, Midwest was not actually injured, and thus critically, could not have brought suit against the AMC defendants until Credit General amended its complaint to enforce the indemnification agreement. *Cf. Massachusetts Electric Co. v. Fletcher, Tilton & Whipple, P.C.,* 394 Mass. 265, 475 N.E.2d 390 (1985) (cause of action in legal malpractice case accrued when plaintiff had been sued as a result of defendant attorneys' allegedly negligent conduct); *Magnuson v. Lake,* 78 Or.App. 620, 717 P.2d 1216 (1986) (same). As noted above, Credit General amended its complaint against Midwest in July 1993. Since Midwest filed suit against the AMC defendants well within two years of this date, the statute of limitations does not bar this action.

### Conclusion

For the foregoing reasons, the court denies third-party defendants' motion to dismiss. This case is scheduled for status on Friday, January 20, 1995 at 9:00 a.m.

---

4. The applicable statute of limitations for Zupan's legal malpractice action was five years. As noted above, Illinois' five-year limitation period was reduced to two years in 1991.