Filed 12/18/14  Smith v. Ricca CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DELMAN SMITH, et al., | H039253 |
| Plaintiffs and Respondents, | (Santa Clara County Super. Ct. No. 112CV228357) |
| v. | **ORDER MODIFYING OPINION** |
| MARIA RICCA, et al., | |
| Defendants and Appellants. | **NO CHANGE IN THE JUDGMENT** |

THE COURT:

The court on its own motion orders that the opinion filed November 25, 2014, be modified as follows:

A.      On page 2, third full paragraph, third sentence, after ". . . dissolution case" and before "(forged declaration theory)" add:  ", and that Smith negligently failed to supervise Newsom in her signing Ricca's name to court-filed documents"

B.      On pages 2-3, third full paragraph, delete fifth sentence, starting with "But Ricca," and add:  "But Ricca had testified at the dissolution proceeding that she had authorized Smith's office to sign her name to an income and expense declaration filed in that proceeding which materially understated her income and did not disclose her employment.  (Later, Ricca testified in the negligence suit that she had understood her

declaration was for a retroactive child support motion and reflected her monthly income for an earlier time period.)"

C.      On page 22, first full paragraph, delete fourth sentence starting with "But it also . . ." and replace it with the following:  "But the Agreement here, unlike the settlement agreement in Siebel, did not expressly provide that Smith was free to pursue claims against appellants."

D.      On page 27, second paragraph, third sentence, after ". . .committed malpractice" add:  ", including his negligent supervision of Newsom's work, '[t]hereby . . . allowing a forged income and expense declaration to be filed in the family court, exposing Ricca to liability, adverse orders and sanctions."

E.      On page 34, first partial paragraph, sixth line, after "alleged that . . ." add: " 'Smith represented orally and in writing to [Ricca] that he was the supervising attorney handling all of the legal filings in the family court action which were filed under his office's letterhead';"

F.      On page 34, first partial paragraph, eighth line, after "penalty of perjury';" add:  " '[t]hese statements were false';"

G.      On page 34, first partial paragraph, tenth line, after ". . . and a crime.'" add: "In the fifth cause of action for professional negligence against Smith, Ricca alleged that Smith's performance fell below the standard of care of a family law attorney by referencing 16 enumerated errors or omissions stated in a prior paragraph of the complaint (paragraph 15(a-p)).  The first of those enumerated errors and omissions was Smith's '[f]iling and causing to be filed on his behalf documents containing forged signatures.'  Another enumerated error and omission was Smith's '[h]aving his paralegal staff regularly as part of the normal practice of the Law Offices of Delman Smith prepare income and expense declarations for clients including Maria Ricca without participation by attorney Delman Smith.' "

2

H.    On page 36, first paragraph, lines 6-7, delete "—such as Ricca's declaration that Newsom forged her signature on the declaration—" and replace it with "—such as Ricca's statements in her declaration that (a) she never withheld information from respondents, (b) she understood that the filed income and expense declarations concerned only her request for retroactive support, (c) she 'never understood that her employment at Tumbleweed was an issue' during the dissolution proceedings, (d) all financial information she gave to respondents was true, and (e) Newsom forged her signature on the declaration—"

The petition for rehearing filed on behalf of appellant William C. Dresser is denied.

The joinder of appellant Maria Ricca in Dresser's petition for rehearing is denied.

The request for publication filed by respondents Delman Smith and Denise Newsom is denied.

There is no change in the judgment.


Date:                                          _____
                                               Márquez, J.



_____               _____
Rushing, P.J.                                  Elia, J.


3

Filed 11/25/14 (unmodified version)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DELMAN SMITH, et al., | H039253 |
| Plaintiffs and Respondents, | (Santa Clara County Super. Ct. No. 112CV228357) |
| v. | |
| MARIA RICCA, et al., | |
| Defendants and Appellants. | |

These appeals challenge the denial of two special motions to strike a complaint filed in the third of a series of related cases. In the first case, respondent Delman Smith, an attorney, represented appellant Maria Ricca in a marital dissolution proceeding that included a dispute about spousal support (dissolution case). Respondent Denise Newsom was a paralegal in Smith's office who assisted Smith by preparing forms submitted to the court. Some time after Smith withdrew as counsel, the court found that Ricca had committed a fraud on the court concerning her income, and it imposed $38,000 in sanctions against her. Ricca, believing she had been poorly represented in the dissolution case, hired appellant William Dresser to sue Smith for legal malpractice and Newsom for negligence (the malpractice/negligence suit; hereafter the "negligence suit"). Ricca dismissed Newsom without prejudice before trial and, after a lengthy court trial, was

unsuccessful against Smith. Two separate judgments were entered in favor of Smith and Newsom (collectively, respondents).

Respondents then brought this case for malicious prosecution against Ricca and Dresser (collectively, appellants). Ricca and Dresser filed separate special motions to strike the malicious prosecution complaint pursuant to Code of Civil Procedure section 425.16,[1] contending it was a strategic lawsuit against public participation (SLAPP) designed to chill their protected constitutional activity. The court denied both motions.

In their separate appeals filed under section 425.16, subdivision (i), Ricca and Dresser assert that respondents did not establish two necessary elements of their malicious prosecution claim: (1) favorable termination; and (2) absence of probable cause. Specifically, they argue that the negligence suit was not favorably terminated on the merits because it was resolved by a postjudgment settlement. And they claim that respondents did not establish that they (Ricca and Dresser) lacked probable cause to initiate and maintain the negligence suit. We disagree.

At this stage of the proceedings, we conclude after a de novo review of the record that respondents (Smith and Newsom) made a sufficient showing that the negligence suit was terminated on the merits in their favor. And respondents made a prima facie showing that, as to at least one theory alleged, Ricca and Dresser lacked probable cause for bringing the negligence suit. The theory alleged was that Smith and Newsom caused an income and expense declaration with Ricca's forged signature to be filed with the court in the dissolution case (forged declaration theory). That forged declaration was at the heart of the court's finding in the dissolution case that Ricca had significantly and intentionally misrepresented her income. But Ricca had also testified that she had given authorization to Smith's office to sign that declaration. Therefore, this evidence was sufficient to support a prima facie showing that Ricca lacked probable cause to pursue the

_____

[1] Further statutory references are to the Code of Civil Procedure unless otherwise stated.

2

forged declaration theory in her negligence suit.  Under the *Bertero* rule (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50 (*Bertero*)), this is a satisfactory showing of a lack of probable cause, even if Ricca had probable cause to assert other theories on which her negligence suit was based.  As to Dresser, there was evidence presented below that while the negligence suit was pending, he was advised in writing that the forged declaration theory was meritless.  Thus, even if Dresser had probable cause to *initiate* the negligence suit under the forged declaration theory, his decision to continue to prosecute the case on that theory after learning it was not supported by probable cause *may* subject him to liability for malicious prosecution.  (*Zamos v. Stroud* (2004) 32 Cal.4th 958 (*Zamos*).)

Respondents have shown a probability of prevailing in that they have "establish[ed] that [their] claim has 'minimal merit [citation] to avoid being stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291 (*Soukup*).) Accordingly, we will affirm the order denying appellants' special motions to strike the complaint.

PROCEDURAL HISTORY

*I.      The Malicious Prosecution Complaint*

Smith and Newsom filed an unverified complaint for malicious prosecution against Ricca and Dresser on July 13, 2012.  The essential allegations of that complaint follow.[2]

In January 2006, Smith was engaged by Ricca to represent her in the dissolution case involving her then-husband, Phillip Bristol.  The scope of Smith's representation was originally limited to child support issues, but was later expanded to embrace all issues pertaining to the parties' marital dissolution.

---

[2] To avoid redundancy, we will dispense with the phrase "respondents alleged" in the succeeding paragraphs in which we describe the allegations of the malicious prosecution complaint.

3

One issue in the dissolution case was Bristol's request for spousal support. Ricca, despite Smith's having advised her of her duties of financial disclosure, concealed the fact that she had become fully employed in March 2007 by Tumbleweed Communications; her annualized salary was $112,000. But shortly before trial, in June 2007, Ricca advised Newsom that she averaged $1,500 per month as income from self-employment, and she authorized Newsom to sign her (Ricca's) name to an income and expense declaration indicating monthly income of $1,500. That declaration was filed with the court. After a trial in July 2007, the court issued a statement of decision that used DissoMaster[3] calculations to determine child support and spousal support in which the court imputed monthly income of $4,000 to Ricca.

In April 2008, Smith withdrew as Ricca's counsel after learning that she had not truthfully disclosed her employment and income. Bristol then filed a motion to vacate the judgment and modify a prior support order. The court modified support and imposed sanctions of $38,000 against Ricca. It concluded that Ricca had made a knowing misrepresentation regarding her income and had committed a fraud upon the court.

On April 9, 2009, Ricca, after hiring new counsel (Dresser), filed a complaint for legal malpractice, negligence, and other claims against Smith and Newsom. Respondents allege the negligence suit "was knowingly false," "was malicious in nature," and was brought without probable cause. Ricca dismissed Newsom from the negligence suit before trial.

On June 29, 2011, after a trial of the negligence suit, the court found in favor of Smith. It held that Ricca had not proved any of her claims against Smith by a preponderance of the evidence. The court first observed that the focus of Ricca's

---

[3] "The DissoMaster is a privately developed computer program used to calculate guideline child support under the algebraic formula required by [Family Code] section 4055. [Citation.]" (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1227, fn. 5.)

negligence suit was that Smith and Newsom had "forged a June 15, 2007 income and expense declaration, knowing that it contained false information, and then filed a knowingly false document with the Court." The court then found that Smith had asked Ricca in June 2007 to provide an updated income and expense declaration, and she responded by providing "a hand-written declaration that, unbeknownst to [Smith], did not list her full-time employment since March 2007 with Tumbleweed Communications at an approximate salary of $115,000. [Smith] had no reason to suspect that [Ricca] had obtained employment, as [Ricca] had continually represented to [Smith] that she did not have the financial resources to pay his legal fees." The trial court further found that "[Smith] credibly testified that [Ricca] did not disclose her income to [Smith] prior to the July 2007 [t]rial"; the court could "conceive of no benefit to . . . Smith or his office for withholding [Ricca's] employment income with Tumbleweed prior to trial"; and "the evidence suggests that [Ricca] was hoping that her Tumbleweed employment would not surface" during the trial in the dissolution case. The court also found in favor of Ricca on a cross-complaint asserted by Smith, indicating it "was not persuaded by a preponderance of the evidence that [Ricca] should pay anymore [*sic*] fees to [Smith]."

A judgment was entered against Ricca and in favor of Smith on July 18, 2011. The judgment also reflected that Ricca prevailed on Smith's cross-complaint. The court indicated that Smith was entitled to costs of suit.

Before Ricca or Dresser appeared in the malicious prosecution suit, Newsom filed a dismissal without prejudice of the malicious prosecution complaint against Dresser only. Although nothing in the record establishes why the dismissal was filed, Dresser was dismissed, according to respondents' brief, because the malicious prosecution claim, as against him, was time-barred.

II.    *The Special Motions to Strike*

On October 16, 2012, Ricca filed a special motion to strike the complaint of Smith and Newsom under the anti-SLAPP statute. Eight days later, Dresser filed a nearly

5

identical special motion to strike Smith's complaint. Dresser concurrently filed a demurrer to the complaint. The demurrer was overruled by the court in the order denying the anti-SLAPP motions. The order overruling demurrer is not at issue in these appeals. (See *In re Troy D.* (1989) 215 Cal.App.3d 889, 896 [order overruling demurrer not appealable].)

Smith and Newsom opposed Ricca's anti-SLAPP motion, and Smith opposed Dresser's nearly identical motion. In denying both motions, the court held that respondents had demonstrated a probability that they would prevail on their malicious prosecution complaint. It found that (1) there had been a favorable termination on the merits of the negligence suit; (2) there was an absence of probable cause for bringing the prior suit; and (3) the prior claim was brought with malice. As to the court's third finding, although Dresser presented considerable argument below that respondents could not establish that the negligence suit was brought with malice, he has abandoned this argument on appeal; we therefore need not consider it. (See *Comstock v. Aber* (2012) 212 Cal.App.4th 931, 943 [appellate court does not address argument addressed at trial level in support of anti-SLAPP motion where it is abandoned on appeal].)

DISCUSSION

*I.        Anti-SLAPP Motions to Strike*

The California Legislature in 1992 enacted Code of Civil Procedure section 425.16—the anti-SLAPP statute—under which SLAPP suits may be disposed of summarily by a special motion to strike under section 425.16. Commonly known as "anti-SLAPP motions," these motions provide "a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.) The statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a

6

special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).) The Legislature has directed that the language of the statute be "construed broadly." (§ 425.16, subd. (a).)

Subdivision (e) of section 425.16 identifies four general categories of activities that constitute " 'act[s] in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.' " that are protected by the statute.  The anti-SLAPP motions here concern appellants' acts of filing and pursuing litigation against Smith and Newsom.  Subdivision (e)(1) of section 425.16 protects "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law."  The California Supreme Court has held that a claim for relief filed with a court is "indisputably 'a statement or writing made before a . . . judicial proceeding [citation]."  (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 90 (*Navellier*).)

A motion to strike under section 425.16 is analyzed and resolved by "engag[ing] in a two-step process.  First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity.  The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the defendant's right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute.  (§ 425.16, subd. (b)(1).)  If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim."  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)  This requires that " 'the plaintiff . . . state[] and substantiate[] a legally sufficient claim.  [Citations.]'  [Citations.]"  (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123 (*Briggs*).)  In establishing this second prong, "[t]he plaintiff need only establish that his or her claim has 'minimal merit'

[citation] to avoid being stricken as a SLAPP. [Citations.]" (*Soukup*, *supra*, 39 Cal.4th at p. 291.) Thus, "[o]nly a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier*, *supra*, 29 Cal.4th at p. 89, original italics.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. We consider 'the pleadings, and supporting and opposing affidavits upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.) "The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence. [Citation.]" (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017 (*Paiva*).) In performing our de novo review, we " 'conduct[] an independent review of the entire record. [Citations.]' [Citation.] [¶] Thus, our review is conducted in the same manner as the trial court in considering an anti-SLAPP motion. In determining whether the defendant . . . has met its initial burden of establishing that the plaintiff's . . . action arises from protected activity, we consider 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b)(2); [citations].) The second prong—i.e., whether the plaintiff . . . has shown a probability of prevailing on the merits—is considered under a standard similar to that employed in determining nonsuit, directed verdict or summary judgment motions. [Citation.]" (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672 (*Paulus*).)

## II.     *Malicious Prosecution*

There are three essential elements to a malicious prosecution claim. First, there had to have been a prior action "commenced by or at the direction of the defendant [that]

8

was pursued to a legal termination in . . . [the] plaintiff's . . . favor." (*Bertero*, *supra*, 13 Cal.3d at p. 50.) Second, the defendant must have brought the prior action without probable cause. (*Ibid.*) And third, the defendant must have initiated the prior action with malice. (*Ibid.*; see also *Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 341 (*Casa Herrera*).) A malicious prosecution claim is properly the subject of a special motion to strike under section 425.16. (*Jarrow Formulas*, *Inc. v. LaMarche* (2003) 31 Cal.4th 728, 735 (*Jarrow Formulas*); *Ross v. Kish* (2006) 145 Cal.App.4th 188, 197 (*Ross*).)

III.     *The Motions to Strike the Complaint Were Properly Denied*

Ricca and Dresser presented below and reiterate on appeal identical arguments and virtually identical evidence in support of their respective motions to strike. They argue[4] that they established that the malicious prosecution suit arose out of activity protected under the anti-SLAPP statute. They assert further that respondents did not establish a probability of prevailing because two elements of their malicious prosecution claims were absent. First, appellants argued that the negligence suit was not terminated on the merits in favor of Smith and Newsom because the parties entered into a postjudgment settlement. Second, they claim there was probable cause for bringing the negligence suit. We address each of these arguments below.

A.     The Complaint Arose Out of Protected Activity

Preliminarily, we note that the activity that forms the basis of the malicious prosecution case here—the initiation and prosecution by Ricca and her attorney Dresser of the underlying negligence suit—was unquestionably protected under section 425.16. The activity constituted "written or oral statement[s] or writing[s] made before a . . .

---

[4] As noted, Newsom filed a dismissal without prejudice of the malicious prosecution complaint as to Dresser before his appearance. Technically, therefore, it is only Ricca who asserted that the complaint as to Newsom should be stricken under section 425.16. Acknowledging this fact, because of the unified arguments presented by appellants in their respective anti-SLAPP motions, we will occasionally make shorthand reference to the contentions that the complaint of Smith and Newsom should be stricken as belonging to both Ricca and Dresser.

9

judicial proceeding" under section subdivision (e)(1) (*Navellier*, *supra*, 29 Cal.4th at p. 90), and "act[s] . . . in furtherance of the person's right of petition" under both the federal and state Constitutions as provided in subdivision (b)(1). (See *Briggs*, *supra*, 19 Cal.4th at p. 1121 [Legislature intended anti-SLAPP statute "to protect all direct petitioning of governmental bodies (including . . . courts . . .)"].) And the California Supreme Court has specifically held that malicious prosecution claims are not exempt from anti-SLAPP motions. (*Jarrow Formulas*, *supra*, 31 Cal.4th 728.) Since it is clear that appellants have readily established the first prong of the anti-SLAPP analysis—that the challenged suit arises from defendants' protected activity—we proceed with an examination of the second prong, i.e., whether respondents presented a prima facie showing of the probable validity of their respective malicious prosecution claims. (See *Paiva*, *supra*, 168 Cal.App.4th at pp. 1017-1018.)

B. Respondents Established a Probability of Prevailing

Respondents " 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by [them] is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817 (*Wilson*); see also *Briggs*, *supra*, 19 Cal.4th at p. 1121.) Here, appellants do not challenge the sufficiency of the malicious prosecution complaint, and we conclude that the complaint is legally sufficient. We thus need only address whether respondents made a prima facie showing in support of their claim; that is, whether respondents established that (1) they obtained a favorable termination of the negligence suit on the merits, and (2) appellants lacked probable cause to bring the negligence suit in the first instance.

1. *Favorable Termination on the Merits*

a. Applicable Law

The element of favorable termination on the merits is not satisfied simply because the malicious prosecution plaintiff prevailed in the underlying action. Rather, "[w]hile

10

the fact [the malicious prosecution plaintiff] has prevailed is an ingredient of a favorable termination, such termination must further reflect on his [or her] innocence of the alleged wrongful conduct.  If the termination does not relate to the merits—reflecting on neither innocence of nor responsibility for the alleged misconduct—the termination is not favorable in the sense it would support a subsequent action for malicious prosecution." (*Lackner v. LaCroix* (1979) 25 Cal.3d 747, 751 (*Lackner*).)  "The theory underlying the requirement of favorable termination is that it tends to indicate the innocence of the accused, and coupled with the other elements of lack of probable cause and malice, establishes the tort . . . [of malicious prosecution]."  (*Jaffe v. Stone* (1941) 18 Cal.2d 146, 150 (*Jaffe*).)  If the resolution of the underlying litigation " ' "leaves some doubt as to the defendant's innocence or liability[, it] is not a favorable termination, and bars that party from bringing a malicious prosecution action against the underlying plaintiff." ' " (*StaffPro, Inc. v. Elite Show Services, Inc.* (2006) 136 Cal.App.4th 1392, 1399-1400.)

" '[W]hen the underlying action is terminated in some manner other than by a judgment on the merits, the court examines the record "to see if the disposition reflects the opinion of the court or the prosecuting party that the action would not succeed." ' [Citations.]" (*Ross*, *supra*, 145 Cal.App.4th at p. 198.)  "To determine whether a party has received a favorable termination, we consider ' "the judgment as a whole in the prior action. . . ." [Citation.]' [Citation.]  Victory following a trial on the merits is not required." (*Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 741 (*Siebel*).)

b. Release Agreement

Appellants claim that the negligence suit was not favorably terminated on the merits.  Both rely substantially on the fact that, after judgment was entered in Smith's favor in Ricca's negligence suit—and some months after judgment was entered on Ricca's dismissal of Newsom without prejudice—the parties entered into a release agreement (Agreement).  Because this postjudgment settlement agreement is the basis upon which appellants contend the negligence suit was not terminated in respondents

11

favor, we will outline this Agreement as a prelude to our consideration of whether respondents made the required prima facie showing.

Ricca, Newsom, and Smith executed the Agreement, which was last-dated August 16, 2011.  There were four recitals in the Agreement concerning the negligence suit: (1) a judgment of dismissal in favor of Newsom was entered on April 12, 2011; (2) a judgment was entered "in favor of Defendant [Smith] and Cross-Defendant [Ricca]" on July 18, 2011; (3) Smith filed a memorandum of costs claiming $14,652 on August 2, 2011; and (4) "the parties desire to settle the issue [*sic*] of costs, and post-judgment actions related to the judgment in *Ricca v. Smith* on the terms set forth herein."

Following the recitals, the first of five enumerated paragraphs provided that Ricca "hereby waives any and all post-judgment motions, appeals, costs, demands, damages, actions, and causes of action of every kind, known or unknown, arising out of or in any way connected with the matters alleged in and the Judgment entered in the [negligence suit]."  In the next two paragraphs, the Agreement indicated that in exchange for Ricca's agreements, (1) "[Newsom] hereby agrees that the Judgment of Dismissal entered in her favor on or about April 12, 2011, is final and that she waives all claims of costs awarded to her related to the Judgment entered on her behalf"; and (2) "[Smith] hereby agrees to waive all costs related to the Judgment entered in his favor on or about July 18, 2011, including the $14,652 of costs filed for on August 2, 2011."  In the last two enumerated paragraphs, Ricca agreed to file a request for dismissal with prejudice of the complaint and Smith agreed to file a request for dismissal with prejudice of the cross-complaint.  It is apparent from the record that requests for dismissal of the action and cross-action were signed by counsel for Ricca and Smith, respectively, but the clerk of the court rejected the filing of the dismissal requests because a judgment had already been entered on July 18, 2011.

c.      Favorable Termination as to Newsom

On February 17, 2011, before trial, Ricca filed a dismissal without prejudice of the negligence suit as against Newsom. A judgment was entered on that dismissal on April 12, 2011 (Newsom Judgment), reflecting that Newsom was awarded her costs of suit incurred in that action in the amount of $5,047. The Newsom Judgment thus provides inferentially that Newsom prevailed in the action, and she contends that it reflects on the merits.

Generally, a voluntary dismissal, even one made without prejudice, is presumed to be a favorable termination on the merits. (*MacDonald v. Joslyn* (1969) 275 Cal.App.2d 282, 289 (*MacDonald*); see also *Oviedo v. Windsor Twelve Properties, LLC* (2012) 212 Cal.App.4th 97, 112 (*Oviedo*).) But, "a 'technical or procedural [termination] as distinguished from a substantive termination' is not favorable for purposes of a malicious prosecution claim. [Citation.] Examples include dismissals (1) on statute of limitations grounds [citations]; (2) pursuant to a settlement [citation]; or (3) on the grounds of laches [citation]." (*Casa Herrera*, *supra*, 32 Cal.4th at p. 342, quoting *Lackner*, *supra*, 25 Cal.3d at p. 751.) As to the second circumstance noted above, " 'the dismissal [resulting from the parties' settlement] reflects ambiguously on the merits of the action as it results from the joint action of the parties, thus leaving open the question of defendant's guilt or innocence. [Citation.]' [Citation.] After all, '[t]he purpose of a settlement is to avoid a determination of the merits.' [Citation.]" (*Pender v. Radin* (1994) 23 Cal.App.4th 1807, 1814.)

Ricca contends the dismissal of Newsom was not a favorable termination on the merits because the parties entered into a postjudgment settlement in which Newsom waived any claim to recover costs under the Newsom Judgment in exchange for Ricca's agreement to forgo any postjudgment motions or appeals in the negligence suit. Relying on *Weaver v. Superior Court* (1979) 95 Cal.App.3d 166 (*Weaver*), disapproved on another ground in *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 883, footnote 9 (*Sheldon Appel*), she asserts that "[w]hen a dismissal results from negotiation,

13

settlement, or consent, a favorable termination is normally not recognized." Ricca offers the following from *Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 882-883 (*Cantu*) in support of her position: "A settlement does not constitute favorable termination of an action for the purpose of a malicious prosecution claim. [Citations.] This rule applies because a dismissal due to settlement, negotiation or compromise reflects ambiguously on the merits of the action and leaves open the question of the defendant's guilt or innocence. [Citations.]"

Ricca's position ignores the fact that the timing of the entry of the dismissal and the parties' settlement suggests that the dismissal *did* in fact reflect on the merits of the negligence suit. The dismissal was entered in February 2011 and the Newsom Judgment was entered on April 12, 2011. *Over four months later*, the parties signed the Agreement. While Ricca characterizes the execution of the Agreement as a settlement that resulted in the dismissal not being a reflection on the merits, this puts the cart (later-signed Agreement) before the horse (dismissal). Although a settlement may not be a favorable termination "because a dismissal *due to* settlement, negotiation or compromise reflects ambiguously on the merits of the action" (*Cantu*, *supra*, 4 Cal.App.4th at pp. 882-883, italics added), the dismissal here plainly was not filed *due to* a settlement.

Further, Ricca's argument ignores the fact that the Newsom Judgment remained unaffected by the terms of the Agreement, except for Newsom's right to pursue statutory costs. The Newsom Judgment was not vacated by the Agreement. And the Agreement contains a specific recital that the Newsom Judgment was entered in Newsom's favor, and that the parties agreed it was "final."

Moreover, we question Ricca's characterization of the Agreement as involving a settlement of her rights against Newsom. She claims that the dismissal, rather than being "a one[-]sided 'cut my losses' settlement," was one in which "Ricca gave up her appellate rights," and Newsom, in exchange, gave up her right to costs. Although it is clear under the Agreement that Newsom waived her right to costs under the judgment of

14

dismissal, it is difficult to understand what rights, if any, Ricca forwent in exchange. At the time the Agreement was entered into, the Newsom Judgment—for which notice of entry was given on April 14, 2011—was final and any right to appeal was time-barred. (See Cal. Rules of Court, rule 8.104(a)(1)(B); see *Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, 56 ["time for appealing judgment is jurisdictional; once deadline expires, appellate court has no power to entertain appeal"]; *Justus v. Atchison* (1977) 19 Cal.3d 564, 568 [case involving multiple parties is ripe for appeal when judgment is entered as to one party that leaves no issue to be determined].) Therefore, Ricca's claim that, under the terms of the Agreement, she "gave up her appellate rights" against Newsom is without merit.

The case of *Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385 (*Sycamore Ridge*) is instructive. There, an apartment owner brought a malicious prosecution suit against the attorneys who had represented a number of the apartment complex's tenants and workers in a prior suit against the owner; the plaintiffs in the prior suit claimed unfair business practices and that the owner had failed to maintain the complex in a habitable condition. (*Id.* at p. 1390.) Shirley Powell, one of the tenant-plaintiffs in the prior suit, voluntarily dismissed her complaint without prejudice; the owner later waived costs in exchange for Powell's agreement that the dismissal be with prejudice. (*Ibid.*) In response to the owner's malicious prosecution suit, the attorney-defendants filed anti-SLAPP motions, arguing, among other things, that Powell's voluntary dismissal could not be considered a favorable termination; they presented evidence that "Powell dismissed her case because of her advanced age and poor health, not because her claims lacked merit." (*Id.* at p. 1400.) But there was contrary evidence, cited by the trial court, "that reasonably suggested that the dismissal occurred because Powell's claims lacked merit, including the fact that Powell failed to appear for two depositions and that she submitted interrogatory responses that indicated she had incurred no damages other than ' "mental and emotional distress," ' after having

15

filed a complaint with 18 causes of action alleging physical injury and property damage." (*Ibid.*) The attorney-defendants argued that the fact that Powell, after filing the without-prejudice dismissal, agreed to file a with-prejudice dismissal in exchange for the owner's waiver of costs, meant there had been a negotiated settlement in which the dismissal did not reflect on the merits. (*Id.* at p. 1401.) The appellate court rejected this argument: "[T]he fact that Powell later dismissed her case with prejudice, after Sycamore Ridge agreed to waive costs, is not determinative on the issue of favorable termination. Powell voluntarily dismissed her claims before any discussions with Sycamore Ridge concerning a waiver of costs." (*Ibid.*) Based upon these circumstances and this conflict in the evidence, the appellate court held that the owner had made a sufficient prima facie showing that the prior case had terminated on the merits in its favor. (*Ibid.*)

Here, Newsom made a prima facie showing—as did the plaintiff in *Sycamore Ridge*—that the negligence suit was terminated on the merits in her favor through Ricca's filing of the dismissal. (See *MacDonald*, *supra*, 275 Cal.App.2d at p. 289.) The fact that, six months later, the parties entered into the Agreement under which Newsom agreed to forgo her costs but the parties otherwise left the Newsom Judgment entered on the dismissal intact and final "is not determinative on the issue of favorable termination." (*Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1401.)

Moreover, respondents' position that there was a favorable termination as to Newsom is given strong support by the California Supreme Court's decision in *Siebel*, *supra*, 41 Cal.4th 735 (discussed in greater detail in connection with Smith's favorable termination showing, *post*). There, the court rejected the notion that a settlement entered into in the underlying case after entry of judgment and while cross-appeals were pending resulted in the litigation not being terminated on the merits as to a defendant who prevailed on all claims. Although the court acknowledged that a pretrial settlement resulting in a stipulated judgment is generally not a favorable termination "because there is nothing to reflect the malicious prosecution plaintiff's innocence on the merits

[citation]," that same conclusion does not apply when there is "a postjudgment settlement by the parties that does not fundamentally change the parties' relationship established by the underlying judgment on the merits." (*Id.* at p. 744.) Here, the settlement embodied in the Agreement did not "fundamentally change the parties' relationship established by the underlying judgment" of dismissal entered several months earlier. The parties agreed the Newsom Judgment "[was] final" and, as noted, Ricca gave up little (if anything) in exchange for Newsom's waiver of costs.

*Weaver*, *supra*, 95 Cal.App.3d 166, relied on by Ricca, does not assist her. There, the plaintiff/physician sued a former patient and her attorney, Weaver, for malicious prosecution of a prior medical malpractice case. (*Id.* at p. 172.) Both defendants moved unsuccessfully for summary judgment and Weaver petitioned for a writ of mandate challenging that order. (*Ibid.*) The appellate court concluded, among other things, that the trial court had properly denied the defendants' motion for summary judgment as to the malicious prosecution claim. Although the plaintiff/patient in the underlying medical malpractice case had filed a voluntary dismissal with prejudice, there was evidence presented that the dismissal was filed to avoid further litigation expense, rather than because the case lacked merit. (*Id.* at p. 184.) Because of the factual conflict as to the circumstances surrounding the dismissal of the underlying suit—a matter for the jury to decide whether the dismissal constituted a favorable termination on the merits—the appellate court concluded that summary judgment was properly denied. But it had not been shown that, as a matter of law, the favorable termination element of the malicious prosecution claim was absent. (*Id.* at pp. 185-186.)

Likewise, here, while Ricca presented some evidence that her dismissal without prejudice should not be deemed a favorable termination, this evidence was in conflict with other evidence that the judgment of dismissal was in fact a favorable termination of the negligence suit in Newsom's favor. We therefore conclude that Ricca's evidence and argument do not negate Newsom's prima facie showing that Ricca's negligence suit was

17

terminated on the merits in Newsom's favor.  (See *Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1401; *Oviedo*, *supra*, 212 Cal.App.4th at pp. 112-113 [plaintiff, in opposing anti-SLAPP motion, made prima facie showing that filing of voluntary dismissal without prejudice of prior action was a favorable termination, notwithstanding defendants' evidence attempting to explain reasons for dismissal].)

d.      Favorable Termination as to Smith

Ricca and Dresser also contend that Smith's malicious prosecution claim against them is without merit because the negligence suit was not terminated on the merits in favor of Smith.  The essential premise of appellants' position once again is that a favorable termination on the merits does not occur when a case is resolved by settlement.  (See *Cantu*, *supra*, 4 Cal.App.4th at pp. 882-883.)  Dresser argues that "the malpractice matter was dismissed by mutual release," a matter that was "ignored" by the court below.  In fact, the negligence suit was not "dismissed by mutual release" as claimed by Dresser.  Dresser also claims that the Agreement was "signed by all parties including Mr. Dresser."  Dresser, however, was neither a party nor a signatory to the Agreement.

Notwithstanding these factual inaccuracies, appellants assert that, as is typically the case with settlements, both sides gave up something of value to end the litigation: Ricca agreed to forgo any rights to bring post-trial motions or an appeal to challenge the judgment entered in July 2011 (Smith Judgment), and Smith agreed to waive his statutory costs.  Because the malicious prosecution suit ended with a settlement, Dresser argues, there was no favorable termination because it did not "tend[] to indicate the innocence of the accused [Smith] . . ." (*Jaffe*, *supra*, 18 Cal.2d at p. 150.)

The issue of whether the negligence suit was terminated in Smith's favor is informed by *Siebel*, *supra*, 41 Cal.4th 735.  There, the malicious prosecution case arose out of a prior suit by a former employee, Debra Christoffers, asserting eight causes of action against her employer, Siebel Systems, Inc. (SSI), and its chief executive officer, Thomas Siebel.  (*Id.* at p. 738.)  Six of the claims—the ones Siebel later relied on in

18

support of his malicious prosecution claim—were resolved in favor of Siebel/SSI by summary adjudication or voluntary dismissal. (*Ibid.*) Christoffers was unsuccessful at trial on her remaining claims of fraud (against Siebel), and her claims of fraud and wrongful termination (against SSI), but the jury awarded her damages of more than $233,000 against SSI for unpaid compensation. (*Ibid.*) A post-trial motion by SSI/Siebel for attorney fees was denied; Christoffers was awarded costs and attorney fees attributable to her unpaid compensation claim against SSI; and Siebel was awarded his litigation costs as the prevailing party as to all claims Christoffers asserted against him personally. (*Id.* at p. 739.) After appeals were filed by all parties, the case settled based upon terms that included (1) SSI's agreement to pay Christoffers approximately 86 percent of the damages and costs she had been awarded; (2) Christoffers' agreement to pay the costs awarded to Siebel; (3) the agreement of Christoffers and her attorneys to release Siebel, SSI, and their attorneys from any claims arising out of the case; (4) the agreement of Siebel, SSI, and their attorneys to release Christoffers, but not her attorneys, E. Rick Buell II and Carol Mittlesteadt; and (5) the settlement agreement "specifically provid[ing] that it did not modify 'the final termination of the Action entered in favor of Siebel for purposes of pursuing claims against Buell or Mittlesteadt, or otherwise prevent Siebel from pursuing any claims against Buell or Mittlesteadt' based on the underlying judgment." (*Ibid.*) The parties thereafter dismissed their respective appeals. (*Ibid.*)

After the conclusion of Christoffers's case, Siebel sued the attorneys, Buell and Mittlesteadt, for malicious prosecution. (*Siebel*, *supra*, 41 Cal.4th at p. 739.) The attorneys moved successfully for summary judgment, the trial court granting the motion on the ground that there had been no favorable termination on the merits of the prior action in Siebel's favor. (*Id.* at p. 740.) This court reversed, concluding, among other things, that the underlying suit had terminated in Siebel's favor. (*Ibid.*) As noted by the California Supreme Court, this court reasoned that "Siebel [had] obtained a favorable termination because the settling parties did not stipulate to a *new judgment* but agreed

19

instead to dismiss their appeals and allow the *existing* judgment to become final." (*Id.* at p. 741, original italics.)

The California Supreme Court affirmed this court's disposition in *Siebel*. In doing so, it rejected the attorneys' claim that "the 'settlement rule' set forth in *Ferreira v. Gray, [Cary, Ware & Freidenrich et al.*] (2001) 87 Cal.App.4th 409 [*Ferreira*]" compelled the conclusion that there was no favorable termination because the judgment was followed by a settlement of the rights and obligations of the parties. (*Siebel*, *supra*, 41 Cal.4th at p. 740.) The Supreme Court approved of this court's analysis distinguishing *Ferreira*. (*Siebel*, at pp. 741-743.) This court had reasoned that in *Ferreira*, the parties had entered into a postjudgment settlement that resulted in the parties' agreeing "to a new disposition and an *amended judgment*." (*Siebel*, at p. 742, original italics.) As the California Supreme Court summarized: "Ultimately, that amended judgment, not the jury verdict, ended the litigation. Conversely, Siebel and Christoffers accepted different rights and obligations between themselves, but did not stipulate to a new judgment. The agreement allowed the *existing* judgment to become final. The Court of Appeal reasoned that, although the settlement agreement compromised certain awarded amounts, the judgment itself, favoring Siebel, remained intact." (*Siebel*, at p. 742, original italics.) The Supreme Court rejected a "blanket rule" under which a postjudgment settlement of the underlying case, as a matter of law, negates the favorable termination element of a subsequent malicious prosecution case. (*Id.* at pp. 742-743.)

The Supreme Court ultimately concluded that there had been a favorable termination on the merits of the underlying suit in favor of Siebel. (*Siebel*, *supra*, 41 Cal.4th at p. 743.) It reasoned: "Here, after a jury trial, Siebel received a favorable judgment on the merits of the claims brought against him. If the parties had not appealed, Siebel would have secured a favorable termination because the judgment 'reflect[ed] the merits of the action and [Siebel's] innocence of the misconduct alleged in the lawsuit. [Citation.]' [Citation.] During the pendency of their appeals, the parties reached a

20

settlement that did not amend the judgment on the merits as it related to Siebel . . . . The underlying judgment for Siebel on the merits was unaffected [by the settlement of Christoffers and SSI in which the dollar amount Christoffers received was compromised]. Because Siebel received a favorable judgment in the underlying proceeding without giving up any portion of the judgment in his favor, we hold that the parties' settlement constitutes a favorable termination. [Citation.]" (*Ibid.*)

There are many similarities between *Siebel* and the case before us. Here, as in Siebel, a judgment was entered in favor of the malicious prosecution plaintiff, Smith, after a full trial on the merits. The trial court found—as enunciated in its statement of decision—that Ricca had not met her burden of proving her case as to any of the seven claims against Smith. And the Smith Judgment provided that it was entered in Smith's favor with his being awarded costs of suit. That judgment, like the judgment in *Siebel*, was never modified, amended, or vacated. The postjudgment Agreement makes no provision for vacating or modifying the judgment entered in Smith's favor. And while the Agreement contains a specific waiver by Ricca of "any and all . . . demands, damages, actions, and causes of action of every kind, known or unknown arising out of or in any way connected with" the negligence suit and the Smith Judgment, there is no similar broad release provided by Smith. Rather, he only agreed "to waive all costs related to the Judgment entered in his favor." Therefore, the principle enunciated by the Supreme Court in *Siebel*—that a malicious prosecution case may be maintained when the "postjudgment settlement by the parties does not fundamentally change the parties' relationship established by the underlying judgment on the merits" (*Siebel*, *supra*, 41 Cal.4th at p. 744)—on its face supports Smith's claim that the negligence suit was terminated on the merits in his favor. (See also *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 214-216 (*HMS Capital*) [plaintiff, who obtained judgment in prior case after trial, made prima facie showing of favorable termination in opposition to anti-SLAPP motion, notwithstanding moving party's contention that there was no

21

favorable termination because parties entered into postjudgment compromise and stipulation concerning amount of costs].)[5]

We acknowledge some differences between *Siebel* and this case. In *Siebel*, the agreement of the parties contained an express provision "that it did not modify 'the final termination of the Action entered in favor of Siebel for purposes of pursuing claims against' " the attorneys for the plaintiff in the underlying action. (*Siebel*, *supra*, 41 Cal.4th at p. 739.) And like in *Seibel*, the Agreement here did not modify the Smith Judgment. But it also did not contain an express provision indicating that the parties were not modifying the judgment for the purpose of expressly allowing Smith to pursue claims against appellants. And under the agreement in *Siebel*, the malicious prosecution plaintiff, Siebel, did not waive all or any portion of his costs as the prevailing party. (*Ibid.*) Here, Smith agreed to waive his claim of $14,652 in costs.

We also acknowledge that there is at least one factor from which it may ultimately be concluded that the negligence suit was not favorably terminated on the merits in favor of Smith. The Agreement required Ricca to give up something of value—her right to bring postjudgment motions or an appeal—in exchange for Smith's agreement to forgo his right to recover costs. In contrast to the circumstances involved in the settlement with Newsom (discussed, *ante*), Ricca's right to appeal was more than a hollow, time-barred right. There was concrete evidence that at the time the parties entered into the Agreement, Ricca was pursuing an appeal. She had discussed the option with Dresser, and Dresser had obtained a cost estimate for the court reporter's transcript. Given that under the Agreement, Ricca and Smith each exchanged something of value, it is possible that it may ultimately be concluded that the postjudgment settlement, unlike the one in *Siebel*, reflected ambiguously on the merits. (See *Cantu*, *supra*, 4 Cal.App.4th at pp. 882-883.)

[5] *HMS Capital*, *supra*, 118 Cal.App.4th 204 was cited with approval by the Supreme Court in *Siebel*, *supra*, 41 Cal.4th at page 743 and footnote 4.

22

But on the record before us, we conclude that Smith has made a prima facie showing that the negligence suit was terminated on the merits in his favor. The fact that appellants can point to some evidence that may ultimately result in a different conclusion being reached at trial or through summary judgment does not affect the conclusion, at this stage of the proceedings, that Smith has shown that his malicious prosecution case has minimal merit. (See *Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1401; *Oviedo*, *supra*, 212 Cal.App.4th at pp. 112-113.)

### 2. *Absence of Probable Cause*

#### a. Applicable Law

Probable cause as an element of a malicious prosecution claim is assessed under the standard of "whether any reasonable attorney would have thought the claim to be tenable. [Citation.] This 'less stringent' standard [citation] is based upon the *Flaherty* test (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637) for determining frivolous appeals, and 'more appropriately reflects the important public policy of avoiding the chilling of novel or debatable legal claims.' [Citation.] The standard is thus designed to accommodate the requirement that the court 'properly take into account the evolutionary potential of legal principles. [Citation.]' [Citation.]" (*Paiva*, *supra*, 168 Cal.App.4th at pp. 1018-1019, citing and quoting *Sheldon Appel*, *supra*, 47 Cal.3d at pp. 885-886.) Thus, "probable cause to bring an action does not depend upon it being meritorious, as such, but upon it being *arguably tenable*, i.e., not so completely lacking in apparent merit that no reasonable attorney would have thought the claim tenable. [Citation.]" (*Wilson*, *supra*, 28 Cal.4th at p. 824, original italics.) " 'Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win. . . .' [Citation.]" (*Sheldon Appel*, *supra*, 47 Cal.3d at p. 885, quoting *In re Marriage of Flaherty*, *supra*, at p. 650.) Stated otherwise, " '[s]uits which all reasonable lawyers agree totally lack merit—that is, those which lack probable cause—are the least meritorious of all meritless suits. Only this subgroup of meritless suits present[s] no

23

probable cause.'  [Citations.]"  (*Jarrow Formulas*, *supra*, 31 Cal.4th at p. 743, fn. 13, quoting *Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 382.)

The trial court must construe the allegations made in the underlying complaint (i.e., the negligence suit) in a light most favorable to the plaintiff in that underlying action (i.e., the malicious prosecution defendant).  (*Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1402.)  "In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought.  A litigant will lack probable cause for his [or her] action either if he [or she] relies upon facts which he [or she] has no reasonable cause to believe to be true, or if he [or she] seeks recovery upon a legal theory which is untenable under the facts known to him [or her]."  (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164-165.)

In a malicious prosecution case, unlike malice, which is a question of fact, probable cause is an issue of law that is determined by the court, except when there is a factual dispute as to what the defendant knew when initiating the prior suit.  (*Sheldon Appel*, *supra*, 47 Cal.3d at pp. 874-875, 884; see also *Citi-Wide Preferred Couriers, Inc. v. Golden Eagle Ins. Corp.* (2003) 114 Cal.App.4th 906, 912 (*Citi-Wide*) [defendant entitled to jury resolution of threshold issue of extent of factual knowledge before court determined probable cause issue].)  Whether there was probable cause for prosecuting the prior action is determined by an objective standard applied to the facts of the case.  In other words, whether the attorney subjectively believed that the prior action was legally tenable has no bearing on the probable cause determination.  (*Sheldon Appel*, at p. 881.)  Thus, although the extent of an attorney's presuit investigation and research may be relevant to the question of malice, unless there is a factual dispute as to what the defendant knew when initiating the prior suit (which is not the case here), it "is not relevant to the probable cause determination."  (*Id.* at p. 883.)  Moreover, since the question of whether the prior action was instituted without probable cause is one of law,

24

expert testimony concerning this element of a malicious prosecution claim is inappropriate because " 'experts may not give opinions on matters which are essentially within the province of the court to decide.' [Citations.]" (*Id.* at p. 884.)

Furthermore, an attorney who commences a lawsuit with probable cause but continues to prosecute it after learning that it is not supported by probable cause may be liable for malicious prosecution. (*Zamos*, *supra*, 32 Cal.4th 958.) Appellate courts have concluded that there may be circumstances in which, under *Zamos*, a nonattorney litigant may also be liable for malicious prosecution for continuing to prosecute a lawsuit after the litigant learns that it is not supported by probable cause, even if the case was initiated with probable cause. (See *Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438, 453; *Paiva*, *supra*, 168 Cal.App.4th at pp. 1030-1031.)

b.  Appellants' Arguments and Evidence

Appellants assert that Smith and Newsom did not show that appellants lacked probable cause for bringing the underlying negligence suit. They each recite the standard for the element of lack of probable cause as enunciated in *Sheldon Appel*, *supra*, 47 Cal.3d 863. Ricca contends that "[i]t cannot reasonably be disputed that there was a substantial legal and factual basis for bringing the cause of action . . . against Smith and Newsom." And she argues that "[p]robable cause was preliminary [*sic*] established when the trial court denied Smith's motion for judgment on the pleadings" in the negligence suit.

Dresser argues that "[n]othing in the record establishes Dresser's lack of probable cause." He contends the trial court made no distinction between Ricca and himself concerning whether respondents showed that appellants lacked probable cause to bring the negligence suit. He argues that, to the extent the court based its decision upon Ricca's admission in her testimony in the dissolution case that she had authorized the signing and filing by Smith's office of the income and expense declaration, this admission is not chargeable to Dresser: "Ricca's personal knowledge, if indeed it defeats

25

her own probable cause . . . is completely irrelevant to Dresser's own state of knowledge, and may not support a finding that [he] filed the lawsuit without probable cause."

Ricca and Dresser rely upon two declarations filed below as establishing the existence of probable cause for bringing the negligence suit: the declaration of Dresser and the declaration of an expert, Jayne Kelly Nordstrom. There was also filed along with appellants' reply papers a declaration signed by Ricca. The three declarations, to the extent they are relevant to the issue of probable cause, are summarized and discussed below.

### i. *Dresser Declaration*

Dresser declared that he agreed to represent Ricca in pursuing claims against Smith only after (1) several conferences with her; (2) reviewing documents from the dissolution case that Ricca supplied him; (3) speaking with Mark Erickson, counsel who succeeded Smith in representing Ricca in the dissolution case; and (4) conducting research concerning Ricca's potential claims. He filed the complaint on Ricca's behalf after further meetings with her and after reviewing documents provided by attorney Erickson.

Dresser also declared that he pursued the case against Smith "based on [his] reasonable evaluation that [Ricca] had a tenable claim for professional negligence and would likely prevail on those claims [*sic*] if pursued through trial." As it relates to the probable cause issue, he opined, among other things, that (1) it was likely that a different trier of fact would have reached a different conclusion in the negligence suit; (2) Ricca testified accurately to the facts as he understood them; (3) Newsom was not a credible witness; (4) the trial court erroneously curtailed his cross-examination of Smith; (5) Smith's testimony was inconsistent; (6) Ricca's expert, Nordstrom, made a more compelling presentation than the testimony given by Smith's expert, Carroll Collins; (7) Erickson was the most believable witness; (8) Erickson testified that "he was delayed in obtaining the underlying file"; (9) Erickson testified that "Smith acted below the

26

standard of care of a family law attorney when he had his paralegal forge Maria Ricca's signature to an Income and Expense Declaration"; and (10) the statement of decision issued by the court covered "[o]nly some of the matters" contained in Dresser's request for a statement of decision and he was prevented from filing objections because a judgment was entered the same day the statement of decision was filed.

### ii.     Nordstrom Declaration

Nordstrom is an attorney who testified as a family law expert in the trial of the negligence suit. Nordstrom opined that Smith committed negligence in a number of different ways, including his "filing and causing to be filed on [his] behalf documents that contained forged signatures," and Newsom's forging of Ricca's signature on an income and expense declaration. Nordstrom—tracking Dresser's declaration—noted approximately 10 other ways in which Smith had, in her opinion, committed malpractice.

### iii.     Ricca Declaration

In her reply declaration, Ricca stated that she never withheld any information from respondents. She declared that she understood the filed income and expense declarations concerned only her request for retroactive support. She also declared that during trial preparations in the dissolution case, she "never understood that [her] employment at Tumbleweed was an issue, and neither Mr. Smith nor Ms. Newson explained that to [her]." The financial information communicated to Smith's office, she said, was "all true." Ricca also declared that Smith and Newsom were aware that she (Ricca) "was working," because, among other things, Newsom left telephone messages at her office number, in which she was identified as working at Tumbleweed. And Ricca declared the conversation Newsom claims she had with her on June 16, 2007, concerning a draft income and expense declaration, never occurred. Finally, Ricca declared that "Newsom forged [Ricca's] name on an income and expense declaration and other documents that contained inaccurate information for the then[-]current time period without [Ricca's] knowledge of what was actually being submitted to the court, or for what purpose."

27

c.      Respondents' Arguments and Evidence

Respondents argued below and contend on appeal that appellants lacked probable cause to bring the negligence suit.  They assert that "each of the [allegations of malpractice, as discussed above in connection with the Nordstrom declaration, is] untenable as either unactionable, known to be false, and/or without any resulting damage."  They argue, among other things, that (1) the court in the dissolution case conclusively found that Ricca had committed a fraud on the court in misrepresenting her income; (2) the court in the negligence suit determined that Ricca's claim was " 'for losses occasioned by her own deceit' "; (3) there was no forgery as alleged by Ricca because Newsom signed the document in question with Ricca's express authorization; and (4) Ricca sustained no damage as a result of any of the alleged actions or inactions of respondents.[6]  Their opposition to the special motions to strike was based upon, among other things, declarations submitted by Newsom and Smith.

i.      *Newsom Declaration*

Newsom explained that she had received a handwritten draft income and expense declaration from Ricca that was dated and sent by fax on June 15, 2007.  In that document, Ricca indicated she was self-employed as a consultant making $4,000 per month.  She and Newsom spoke the next day.  Newsom asked Ricca questions about all four pages of the draft document.  Ricca advised Newsom that the document contained incorrect information, including that Ricca's monthly income from self-employment should be listed as $2,000, rather than $4,000.  Ricca did not tell Newsom that she was employed by a third party.  At the end of their conversation, after Newsom had revised

---

[6] Contrary to their obligations under rule 8.204(a)(1)(C) of the California Rules of Court, respondents provide no citation to the record in support of this fourth argument. The court may disregard any contentions made by the parties in their appellate briefs that are unsupported by citations to the record. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239.)

28

the document, Ricca stated that she could not come to the office to sign the finalized declaration because of personal commitments. Ricca instructed Newsom to sign the finalized document; Newsom did so and it was filed with the court. The income and expense declaration filed with the court indicated that Ricca's monthly income from self-employment was $1,500. (It is unclear why the declaration filed with the court reflected a monthly income of $1,500, instead of $2,000, as Newsom declared Ricca had reported to her.)

Newsom also declared that on August 29, 2007—after a hearing in the dissolution case—Newsom sent Ricca an e-mail advising her that progress was being made on the proposed statement of decision and requested that Ricca provide a "breakdown of her income during the periods from [date of separation] to present." Ricca replied to Newsom's e-mail on the same day: "I did not receive income until January 2005 and then it was [$]4,000 a month until August [2007] (?it is in our child support motion) when it was cut in half ([$]2,000/mo) which lasted until mid September and then [$]0. Please let me know if you need more accuracy—this is from memory and I know it is in our I&E's [income and expense declarations]."

Newsom also declared that Ricca "continued to represent she was not employed until her e-mail of March 31, 2008." In that e-mail to Smith, Ricca stated: "Yes, I am employed at Tumbleweed. Seems you can Google me and this now comes up. I was never asked the question so is that an issue?"

### ii. Smith Declaration

Smith submitted separate declarations in opposition to the two special motions to strike. The declarations were virtually identical and both contained a number of exhibits, which were the same for both declarations. (Since the Smith declarations are virtually identical, we will refer to them singularly.)[7]

---

[7] Some of the exhibits to Smith's declarations discussed, *post* (e.g., the statement of decision and judgment entered on July 18, 2011, and the reporter's transcript from the

Smith declared that Ricca hired him in January 2006 to represent her in the dissolution case. He advised Ricca of her fiduciary duty "to make a full and accurate disclosure of all assets and liabilities in a proceeding for the dissolution of marriage," including an obligation to update and augment those disclosures. Before the August 2007 hearing in the dissolution case, Smith advised Ricca in an e-mail dated June 29, 2007, that she was "required to disclose all of [her] current financial circumstances, especially on the eve of trial." She responded the same day by e-mail, stating: "As to the other issue contained in your email that has been discussed with you previously[,] I assume you are talking about income? If so[,] I did disclose all financial numbers to you and they are accurately stated in the I&E [Income & Expense]."

Smith also sent an e-mail to Ricca on July 9, 2007, indicating "[i]t is not clear to me whether you are working or not. I assume not since you are unable to pay me, but if you have a job, you are required to disclose it." Ricca responded to Smith by e-mail on July 12, 2007: "My understanding is that the third topic [of Smith's July 9 e-mail, concerning employment] was dealt with when we had the discussion in your office and prepared for the settlement conference. I have not been asked for further information nor have I instructed you to remain silent on any matters. There are no hidden assets on my end."

Ricca did not disclose to Smith that she had become fully employed as of March 1, 2007, at an annual salary of $112,000. Smith's declaration attached an offer letter dated February 22, 2007, signed by Tumbleweed Communications Corporation and Ricca, confirming Ricca's employment as program manager, effective March 1, 2007, with an

November 24, 2008 hearing in the dissolution case), were also documents of which Smith requested the trial court take judicial notice. The court below granted the request for judicial notice. (See Evid. Code, § 452, subd. (d).) We likewise take judicial notice of these documents. (See Evid. Code, § 459, subd. (a).)

annual salary of $112,000. Smith did not learn of Ricca's employment until more than a year later, on March 31, 2008.

Smith declared that at the hearing in the dissolution case on August 20, 2007, Ricca testified that she had authorized Smith's office to sign her name to the income and expense declaration. The reporter's transcript attached to his declaration discloses that Ricca testified twice that she had authorized Smith's office to affix her signature to the declaration.

Smith also attached excerpts of the reporter's transcript from the November 24, 2008 hearing in the dissolution case on the request of Ricca's ex-husband (Bristol) to set aside a support order and for recalculation of child and spousal support. The family court found that Ricca was employed as of March 1, 2007, earning a monthly salary of $9,333, which was increased to $10,833 as of April 14, 2008. The family court also found by clear and convincing evidence that Ricca had committed fraud. According to the court, Ricca "made a representation to the Court and [Bristol], that she knew was false, that she was making $1,500 per month from self-employment at a time she was employed at the rate of $9,333 per month." The court ordered Ricca to pay sanctions of $38,000 within 90 days of its order. The court observed: "[Ricca's] misrepresentation to the Court and [Bristol] regarding her income is the type of statement which litigants may be tempted to make if they think they can get away with it. It took a substantial amount of attorney time to uncover and to lay out to the Court all the facts to reveal exactly what happened."[8]

In April 2010 (approximately 14 months before the trial of the negligence suit), James Murphy, counsel for Smith and Newsom, sent a letter to Dresser indicating that Murphy would seek to recover reasonable expenses and attorneys' fees under Code of

---

[8] In a prior judgment filed in February 2008, the family court had imposed sanctions of $17,000 against Ricca because she had "consistently failed to be forthcoming regarding documents and information" concerning her assets and property.

Civil Procedure section 128.5 for having to defend a "frivolous action" unless the suit was immediately dismissed with prejudice. The letter was attached as an exhibit to Smith's declaration. Murphy's correspondence focused on the allegation that respondents had filed documents with forged signatures that contained false information about Ricca's income. Murphy asserted the actual facts were that Ricca had given Newsom information about her income and employment that was false, and Ricca had authorized Newsom to sign Ricca's name on a declaration containing the false information.

The trial court, in its statement of decision and judgment in Smith's favor in the negligence suit (attached as exhibits to Smith's declaration), found in favor of Smith on all seven causes of action. The court observed that the essence of the case was one for legal malpractice arising out of Smith's representation of Ricca in the dissolution case. It found Ricca's claims were ones that "all effectively [arose] from [Ricca's] own misconduct." The court noted that after Smith had withdrawn as counsel, the family court had imposed sanctions of $38,000 against Ricca, finding she had "committed fraud by knowingly submitting a false income and expense declaration that did not disclose her full-time employment and annual salary in the approximate amount of $115,000.00." Ricca had invoked the Fifth Amendment privilege against self-incrimination rather than giving testimony in the dissolution case, so this finding was based upon the testimony of Newsom. The court in the negligence suit concluded that Ricca had not met her burden of establishing any of her claims. In so holding, it observed that Ricca had not presented "a coherent explanation" for not disclosing her employment at Tumbleweed Communications, and it could "conceive of no benefit to Defendant Smith or his office for withholding [Ricca's] employment income with Tumbleweed prior to trial."

d.      Lack of Probable Cause Was Shown

Our analysis of whether respondents made a prima facie showing that Ricca and Dresser lacked probable cause to initiate and prosecute the negligence suit will focus on

32

one of the grounds of liability alleged by Ricca: the forged declaration theory. Although the parties argue other theories alleged in the underlying action, we need not address whether there was a lack of probable cause for Ricca's assertion of them because, as we will discuss, *post*, respondents demonstrated a lack of probable cause relative to the theory that Newsom forged Ricca's signature on a declaration filed in the dissolution case. Respondents' showing was sufficient to meet their burden of establishing this element of malicious prosecution.

### i. *The Complaint*

In considering the allegations of the underlying complaint in a light most favorable to appellants (see *Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1402), we observe that the negligence complaint is replete with allegations concerning the forged declaration theory. The theory is specifically mentioned in support of the first five causes of action, i.e., the claims for breach of contract against Smith; negligence against Newsom; derivative liability for negligence (based on Newsom's acts) against Smith; and fraud against Smith and Newsom. In the fourth cause of action for fraud, for instance, Ricca alleged that "Newsome [*sic*] individually and on behalf of Defendant Smith represented to the Court that the documents filed which contained a forged signature were truthful and contained accurate signatures to verifications made under penalty of perjury"; and "respondents' deceit on the Court . . . in the filing of documents containing forged signatures and false information is also fraud and a crime." And Ricca incorporated by reference all of the preceding allegations of the complaint (including those relating to the forged declaration theory) in the sixth through eighth causes of action. It is thus unsurprising that the trial judge in the negligence suit found the forged declaration theory was "[t]he focus of [Ricca's] allegations against [Smith]."

### ii. *Evidence Established Lack of Probable Cause*

There was significant evidence presented to the court below that appellants lacked probable cause to assert the forged declaration theory. The circumstances of the

33

preparation of Ricca's declaration, as recounted by Newsom in her declaration, underscore the highly questionable merits of the theory. According to Newsom, Ricca prepared and faxed to Newsom in June 2007 a draft declaration indicating that Ricca was not employed and had $4,000 monthly income. Ricca and Newsom then discussed the contents of each of the four pages of the draft, and Ricca advised Newsom that her monthly income was $2,000, rather than the $4,000 figure stated. According to Newsom, Ricca then specifically authorized Newsom to revise the declaration to include the information provided by Ricca and to sign it on Ricca's behalf; Newsom did so, and filed the declaration with the court. Ricca twice verified the accuracy of the declaration's contents in e-mails to Smith's office on June 29 and August 29, 2007.

Ricca's own testimony also refutes her forged declaration theory. At the hearing in the dissolution case, Ricca testified in response to Smith's questioning that the signature on the declaration did not appear to be hers, but that "I think it was done through your office where I had asked them to sign it for me." When questioned further on the subject by the family court judge, Ricca testified: "I authorized that signature. So, yes, I guess it's mine."

According to respondents' declarations, Ricca misrepresented her income to them, despite follow-up communications from them asking her to confirm the amount of her income. Newsom and Smith both declared that Ricca did not disclose her employment with Tumbleweed Communications until March 31, 2008, more than a year after she started work there. This omission is borne out by Ricca's July 12, 2007 e-mail to Smith, in which she, in response to his inquiry as to whether she was employed (with his assumption that she was not), did not disclose her employment with Tumbleweed, instead stating: "There are no hidden assets on my end." It is also noteworthy that when Ricca confirmed her employment in an e-mail to Smith on March 31, 2008, she did not indicate that she had disclosed this fact previously. Instead, she said: "I was never asked the question so is that an issue?"

Moreover, the family court, after hearing testimony from Newsom, found by clear and convincing evidence that Ricca had committed fraud.  The court concluded that Ricca had knowingly misrepresented to the court and Bristol that her monthly income from being self-employed was $1,500, when in fact she was employed earning a salary of $9,333 per month.  We take judicial notice of the fact that the family court made these particular findings.  (See *Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 121 [court takes judicial notice that judge made specific findings in an order, but does not judicially notice truth of those findings].)  The fact that the family court made these findings informs the question of whether appellants had probable cause to assert the forged declaration theory.

From this evidence, a court could conclude that there was no probable cause for appellants' assertion of the forged declaration theory.  (See *HMS Capital*, *supra*, 118 Cal.App.4th at p. 217 [concluding plaintiff, in opposing anti-SLAPP motion, made prima facie showing that defendant lacked probable cause where facts presented "could demonstrate that there was no evidence upon which" defendant could reasonably assert claim].)  Appellants' contradictory evidence—such as Ricca's declaration that Newsom forged her signature on the declaration—does not defeat respondents' prima facie showing of an absence of probable cause.  (See *Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3 [court addressing anti-SLAPP motion does not weigh evidence or assess credibility of witnesses; *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 585 ["defendant's evidence is considered with a view toward whether it defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element"].)

### iii.    *Judgment on the Pleadings Order*

Ricca argues that respondents cannot show an absence of probable cause because Smith's pretrial motion for judgment on the pleadings in the negligence suit was denied on June 8, 2011.  This argument is made without citation to legal authority to support it

and is thus one that we may choose to disregard. (*People v.Stanley* (1995) 10 Cal.4th 764, 793.) Nonetheless, the contention is without merit.

The motion for judgment on the pleadings was based "on the ground that [Ricca's entire first amended complaint] was barred by the defense of unclean hands." The court denied the motion because it was "not apparent from either the face of the [pleading] or the material submitted for judicial notice that unclean hands is a defense to all of the claims in the [pleading]." The denial of Smith's motion was not one in which the court determined that Ricca's negligence suit had merit. It is thus unlike instances in which it may be inferred that there was a finding that the underlying claim was tenable because of a temporary result favorable to the malicious prosecution defendant, such as where that defendant receives a favorable (1) judgment that is ultimately reversed (see *White v. Lieberman* (2002) 103 Cal.App.4th 210, 218); (2) order denying a defense motion for summary judgment (see *Hutton v. Hafif* (2007) 150 Cal.App.4th 527, 550); or (3) order granting the issuance of a preliminary injunction (see *Paiva*, *supra*, 168 Cal.App.4th at p. 1020). The overruling of Smith's motion for judgment on the pleadings did not constitute an adjudication that the negligence suit was brought with probable cause. (See *Ross*, *supra*, 145 Cal.App.4th at p. 203 [court's overruling demurrer to complaint in underlying action, where there was no finding of fact associated with ruling, did not establish probable cause].)

### iv. Dresser's Further Contentions

Dresser argues that even if there was sufficient evidence presented that Ricca lacked probable cause to bring the negligence suit, this evidence is not chargeable to him, since he was not involved in that case and there is no evidence he was aware of Ricca's testimony. He asserts that "[n]o evidence whatsoever was presented to the trial court to refute Dresser's knowledge at the relevant time he filed and pursued the malpractice lawsuit." Dresser also argues that nothing in Murphy's letter that was sent "long-after

36

[*sic*] the malpractice lawsuit was filed" provided facts from which Dresser should have concluded that the case was brought without probable cause.

This argument lacks merit because, among other things, it improperly applies a subjective standard to the probable cause element that is governed by an objective standard. (See *Sheldon Appel*, *supra*, 47 Cal.3d at p. 881.) Whether an attorney subjectively believed that the prior action was legally tenable has no bearing on the probable cause determination. (*Ibid.*) Dresser's declaration that he conducted extensive presuit investigation—including conferences with Ricca and Erickson (legal counsel who succeeded Smith in the dissolution case) and review of documents provided by them concerning the dissolution case—raises issues concerning what Dresser in fact knew before filing suit. For instance, since the dissolution case documents provided by Ricca and Erickson are not specified in the Dresser declaration, the trial court could ask whether any of these documents contained Ricca's testimony about the declaration or in any way suggested Ricca authorized Smith's office to sign the declaration on her behalf. These are among the issues the court below must consider in its ultimate determination of whether Dresser lacked probable cause to bring and maintain the negligence suit.

As noted, the forged declaration theory was a central part of the negligence suit. As such, a reasonable attorney conducting an investigation in advance of filing suit may have sought and obtained deposition or trial testimony concerning the Ricca declaration. That attorney would have learned that Ricca had plainly testified in the dissolution case that she had authorized Smith's office to sign the declaration on her behalf, and that she was sanctioned $38,000 for committing a fraud on the court.

Further, in his letter of April 16, 2010, Murphy requested that Dresser immediately dismiss the negligence suit with prejudice to avoid Murphy's seeking sanctions in the form of "reasonable expenses and attorneys' fees in defending what we believe to be a frivolous action." In that letter, Murphy specifically addressed the forged declaration theory, indicating it was meritless. Murphy outlined the circumstances under

37

which the document was prepared and signed (which tracked Newsom's declaration signed much later in the present case), and noted that Ricca had testified before the family court that she had authorized Newsom to sign the declaration on her behalf.  Thus, assuming for the sake of argument that the record did not establish a prima facie case that Dresser lacked probable cause to *initiate* the negligence suit containing the forged declaration theory, there was evidence, including Murphy's letter, that supported a prima facie showing that Dresser *continued to prosecute* the suit after learning it was meritless.  (See *Zamos*, *supra*, 32 Cal.4th 958 [attorney who commences lawsuit with probable cause but continues to prosecute it after learning that it is not supported by probable cause may be liable for malicious prosecution].)[9]

There is thus evidence supporting the conclusion that respondents made a prima facie showing that Ricca and Dresser initiated and prosecuted the forged declaration theory in the negligence suit without probable cause.  As we will discuss, under the *Bertero* rule, the fact that the suit contained theories other than the forged declaration theory, even if there was probable cause supporting those theories, does not bar respondents' malicious prosecution claim.

<em>v.</em>  The Bertero <em>Rule</em>

In *Bertero*, *supra*, 13 Cal.3d 43, the California Supreme Court addressed the propriety of a jury instruction providing that the defendant " 'cannot escape liability for the malicious prosecution of a claim for which he did not have probable cause by joining

---

[9] Our conclusion that respondents, at this stage of the proceedings, made a prima facie showing that Dresser lacked probable cause to bring the negligence suit with the forged declaration theory—or to continue to prosecute the suit after learning that it was not objectively tenable (see *Zamos*, *supra*, 32 Cal.4th 958)—should not be construed as a view concerning whether or not respondents will ultimately prevail in their malicious prosecution suit.  It may be that Dresser will ultimately establish that the forged declaration theory, although unsuccessful, was one that was nonetheless supported by probable cause in that it was "*arguably tenable*, i.e., not so completely lacking in apparent merit that no reasonable attorney would have thought the claim tenable. [Citation.]"  (*Wilson*, *supra*, 28 Cal.4th at p. 824.)

it with a claim for which he did have probable cause to assert.' " (*Id.* at p. 55, fn. 4.)  The court held that this was a correct statement of the law.  The court, in part, relied on reasoning from an early case from Missouri:  "Confronted with a similar question, the Supreme Court of Missouri reasoned, . . . 'it would seem almost a mockery to hold that, by uniting groundless accusations with those for which probable cause might exist, the defendants could thereby escape liability, because of the injured party's inability to divide his damages between the two with delicate nicety.' [Citation.]" (*Id.* at p. 56, quoting *Boogher v. Bryant* (1885) 86 Mo. 42, 50.)  The *Bertero* court rejected the argument that the proper inquiry was whether the malicious prosecution defendants had a reasonable ground for seeking the ultimate relief they sought in the underlying case, rather than " 'whether they had such grounds for asserting each of [their] three theories.' " (*Bertero*, at p. 57.)  It held:  "A plaintiff acting in good faith may safely sue on alternative theories after full disclosure to counsel when he [or she] possesses a reasonable belief in the validity of *each* of those theories. . . . We see no reason for permitting plaintiffs and cross-complainants to pursue shotgun tactics by proceeding on counts and theories which they knew or should know to be groundless." (*Ibid.*, italics in original.)

Twenty years later, the California Supreme Court had the opportunity to revisit the *Bertero* rule in a case in which it was claimed by the malicious prosecution plaintiff that only some of the six grounds alleged by the contestant and her attorneys in an underlying will contest were prosecuted without probable cause.  (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 674-675, 676 (*Crowley*).)  The court upheld the appellate court's determination that under the *Bertero* rule, a claim for malicious prosecution had been stated "even though it does not allege that every one of the grounds asserted in the will contest lacked probable cause." (*Crowley*, at p. 679; see also *Citi-Wide*, *supra*, 114 Cal.App.4th 906 [*Bertero* rule applied where there was no probable cause as to most, but not all, of damages sought in underlying action]; *Mabie v. Hyatt* (1998)

39

61 Cal.App.4th 581 [*Bertero* rule applied where underlying claim alleging fraud, conspiracy, and malice lacked probable cause, even though separate claim for cancellation of note and deed of trust was supported by probable cause].)

Here, respondents made a prima facie showing that Ricca and Dresser lacked probable cause to initiate and maintain the forged declaration theory of the negligence suit. Under *Bertero*, *supra*, 13 Cal.3d at pages 55 to 57, the fact that Ricca alleged in her complaint a number of other theories in support of many of her causes of action does not defeat respondents' malicious prosecution suit. For instance, Ricca also claimed that Smith committed negligence by unreasonably demanding fees that were not yet owing; by withholding the litigation file from Ricca's successor counsel; and by preparing an unmeritorious motion for retroactive support. Although we acknowledge that the court in *Bertero* and *Crowley* was not addressing the precise circumstance raised here—a suit in which one (but not necessarily all) of the legal theories supporting the individual causes of action was not supported by probable cause—the *Bertero* rule nonetheless applies. In *Bertero*, the court opposed litigants' use of "shotgun tactics" in pursuing groundless "counts and *theories*." (*Bertero*, at p. 57, italics added.) In *Crowley*, *supra*, 8 Cal.4th 666, the court noted that the plaintiff in the underlying suit could not escape potential liability for malicious prosecution by having "probable cause to assert [the] cause of action on one *ground* of liability . . . when the other *grounds* lack[] probable cause." (*Id.* at p. 683, italics added.) The forged declaration theory here was undoubtedly a "theory" and a "ground" of liability asserted by Ricca in the underlying negligence suit.

Even were the *Bertero* rule inapplicable where one or more (but not all) *theories of liability* for a particular cause of action were prosecuted without probable cause—a conclusion we do not reach here—the *Bertero* rule would nonetheless apply. The third cause of action for derivative liability for negligence against Smith and the fourth cause of action for fraud against Smith and Newsom are based solely on the allegation that

40

Ricca was damaged as a result of respondents' actions in presenting a forged declaration before the family court.  Because respondents have made a prima facie showing that there was no probable cause for asserting these two claims (as opposed to theories of liability), the *Bertero* rule applies to this case in any event.[10]

### 3. Conclusion

We have determined that respondents made a prima facie showing of the two challenged elements of their malicious prosecution suit, i.e., that the underlying negligence suit was terminated on the merits in respondents favor, and that appellants lacked probable cause for initiating and maintaining the suit.  Respondents have therefore satisfied the second prong of the court's evaluation of a special motion to strike under section 425.16, namely "establish[ing] that [their] claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP."  (*Soukup*, *supra*, 39 Cal.4th at p. 291.)  Accordingly, the trial court properly denied the respective anti-SLAPP motions brought by Ricca and Dresser.

### DISPOSITION

The order denying the special motions of appellants Maria Ricca and William Dresser to strike the complaint, pursuant to the anti-SLAPP statute, is affirmed.

---

[10] Because we have concluded that respondents made a prima facie showing that appellants lacked probable cause to initiate and maintain the forged declaration theory of the negligence suit, we need not consider whether such a prima facie showing of this element was made by respondents as to other theories alleged by Ricca in the underlying suit.  (See *Hiser v. Bell Helicopter Textron Inc.* (2003) 111 Cal.App.4th 640, 655 [appellate courts generally "decline to decide questions not necessary to the decision"].)

_____
　　　　　　　　　　Márquez, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.